OPINION OF THE COURT BY JUSTICE HUGHES
Appellees, officials in the Breathitt County school system, sought qualified official immunity from a suit brought by Jane Doe and her mother based on sexual abuse Doe experienced as a middle-school student. Doe and her mother alleged that Appellees breached their ministerial duties to supervise students and to report abuse, and acted in bad faith in their handling of misconduct claims involving Charles Mitchell, a former teacher. The Breathitt Circuit Court denied Appellees' motion for summary judgment based on their claims of qualified official immunity. The Court of Appeals reversed that judgment, finding that qualified immunity applied because the Appellees' acts, or inactions, were discretionary, were within the scope of their authority, and were undertaken in good faith. On discretionary review, we affirm the Court of Appeals, but limit the holding to the specific claims alleged by Jane Doe.
FACTUAL AND PROCEDURAL BACKGROUND
Beginning in the late summer or early fall of 2009, "Jane Doe,"[1] a student at Sebastian Middle School in Breathitt County, Kentucky, began receiving inappropriate and sexually suggestive text messages from her former teacher Charles "Andy" Mitchell. Mitchell, who had been Doe's eighth grade teacher, exchanged messages with Doe for approximately twenty-one months, with the last one occurring in early April 2011. During that time, he sent her over one thousand messages *827 by text and through Facebook and other social media. The messages between Mitchell and Doe included sexual innuendoes and an exchange of nude photographs. Within the first eleven months of that period, while Doe was a freshman, Mitchell and Doe engaged in a sexual relationship that occurred in his middle school classroom.[2] In total, Mitchell and Doe had sexual intercourse three times and Doe performed oral sex on Mitchell twice. The physical sexual contact ended prior to May 2010. Mitchell's relationship with Doe remained secret and was not revealed until a police investigation in August 2011 prompted by Mitchell's communications with another student.
As Doe's freshman year was coming to an end in the spring of 2010, Mitchell began texting a student named "Betty."[3] Mitchell was Betty's academic team coach. Betty grew uncomfortable with the number of texts received from Mitchell over a two-week period and she told her mother. On the last Friday of that period, May 14, Betty's mother monitored the exchange between Betty and Mitchell. Betty's mother took the phone afterward, examined the texts from Mitchell, and printed the billing summary for the phone at that point.
The following Monday Betty's parents met with Breathitt County Schools Superintendent Arch Turner and Sebastian Middle School Principal Reggie Hamilton to express their concerns about the large number of texts exchanged and the time of the texts. They specifically noted that one day, 168 texts were exchanged between 3:11 p.m. and 9:50 p.m.[4] While the messages concerned general matters, such as school and guitar lessons, Mitchell also discussed another student's relationship with her boyfriend and whether the couple should break-up.[5] Although Betty told her parents the messages did not contain sexual content and there was no sexual content in the messages they viewed, Betty's parents were concerned. They asked Turner to stop Mitchell's texting to Betty.
After the first of two meetings with Superintendent Turner, Betty's father went to the Jackson City Police Department. According to his deposition testimony, the two officers he spoke with basically said, "Our hands are tied. There's nothing we can do about it. [Mitchell] didn't say nothing out of the way to your daughter."
In response to Betty's parents' concerns, Turner conducted further investigation into Mitchell's communications with Betty. On the same day, the school officials interviewed two other students identified as texting with Mitchell. The students' mothers were also contacted by phone and interviewed. All indicated no inappropriate texting occurred with the students, and statements to that effect were obtained for the school's file. Mitchell also provided a statement admitting he texted Betty and that the messages were about school, guitar lessons, and another student's boyfriend;
*828 he stated he had done nothing wrong.
Turner found the excessive messaging inappropriate, and orally instructed Mitchell not to text Betty.[6] Turner informed Mitchell in writing that three disciplinary actions would be taken: he would be suspended for ten days without pay; he would be placed on an improvement plan for the 2010-2011 school year with eventual completion of specified goals;[7] and he would complete ethics training. Hamilton or Napier also explained to Mitchell that if Betty's father filed suit, the sheer number of texts might lead to him being fired.
Turner also asked Mitchell orally, either in person or through Hamilton, for transcripts of any text messages with Betty for the two months prior to Betty's parents contacting Turner and Hamilton. (It is unclear why Turner chose this time frame and there is no evidence that Mitchell started texting her before May 1, the start of the two-week period that ended with Betty telling her mother about the texts.). Turner asked that the transcripts be provided as soon as possible; even though he did not believe there would be any inappropriate content based on the consistency of reporting from the parents, the students, and Mitchell, as a safeguard, he wanted to see for himself the content and amount of texting. Hamilton was given the responsibility of getting the transcripts from Mitchell, but his persistent efforts were unsuccessful.[8] After Mitchell's failure to turn over the messages, Hamilton sent him a letter requesting again the text message transcripts and informing that "[i]n the event of future litigation, the Breathitt County Board of Education will not ensure its support without prior knowledge of the conversations contained in these transcripts."[9] Mitchell did not obtain or turn *829 over any transcripts and Betty's parents' efforts to obtain them were unsuccessful. Mitchell's reprimand was never revisited.
One year later, in May 2011, Hamilton was informed of inappropriate messaging between Mitchell and another student named "Cindy." A classmate of Cindy's who viewed the messages was concerned and took screenshots of the messages to Michael Bowling, a teacher at the school. Subsequently, Bowling took the messages to Hamilton who in turn contacted Assistant Superintendent of Breathitt County Schools David Napier. Napier and Hamilton consulted with Phillip Watts, the school's information technology specialist, to assess the authenticity of the screenshots. Watts opined that the screenshots looked real but he was unable to determine whether they were from a real conversation or from a fake or staged Facebook account.
Afterwards, school authorities conducted a series of interviews to assess whether Mitchell was engaged in an inappropriate relationship. When questioned, Cindy, her mother, and Mitchell all denied the allegations. School authorities also questioned numerous co-workers of Mitchell and other students about the alleged relationship. Ultimately, Mitchell elected to resign because of these new inappropriate texting allegations. Despite Mitchell's resignation and the investigation into his actions, school authorities did not alert anyone outside the school system.
Approximately three weeks after the school authorities began investigating whether Mitchell had been in a relationship with Cindy, the Kentucky State Police opened an inquiry into this matter. The police were spurred on by a report from the local television station that a teacher had been engaging in sexual contact with a student. Within two days, police had interviewed Cindy and other students and had confirmed that the screenshots were authentic. Charges were filed, and Mitchell was imprisoned after pleading guilty in 2012 to first-degree sexual abuse, distributing obscene materials to minors, prohibited use of electric communication systems to procure sex from a minor (four counts), third-degree rape (five counts), and sodomy in the third degree (three counts). Additionally, due to their failure to report the incident involving Cindy to the authorities in May 2011, Turner, Napier, Hamilton, and Bowling were charged with failure to report child dependency, neglect or abuse. Following a bench trial, Turner, Napier, and Hamilton were each found guilty.[10] ,[11]
In September 2011, Jane Doe's mother filed a civil suit on behalf of her daughter against Turner, Hamilton, Napier, and Bowling[12] (collectively referred to as *830 "school officials") in their official and individual capacities. Among the varied claims asserted were: negligence; negligent hiring, training, supervision, and retention; negligent and intentional infliction of emotional distress; outrage; harassment; battery; breach of contract; and loss of consortium. Doe sought damages, inter alia, for past, present, and future mental and physical pain and suffering. In July 2012, the circuit court dismissed the claims brought against the Appellees in their official capacities. In February 2015, the Appellees sought summary judgment on claims brought against them in their individual capacities on the basis of qualified immunity, but the motion was denied.
On interlocutory appeal of that denial, the Court of Appeals concluded that the Appellees' acts, or inactions, in this case were discretionary because they involved a more general duty to supervise the students rather than a specific duty. Further, the Court of Appeals determined that the reporting requirement for abuse and neglect under Kentucky Revised Statute (KRS) 620.030 constitutes a discretionary action and the Appellees' decision not to report Mitchell was made in good faith. The Court of Appeals reversed the circuit court's denial of summary judgment and remanded the case for dismissal of Doe's claims against Appellees.
We granted discretionary review of this interlocutory appeal to determine whether the Appellees are entitled to qualified official immunity. Breathitt Cty. Bd. of Educ. v. Prater, 292 S.W.3d 883, 887 (Ky. 2009). Based on careful examination of the record before us, we conclude they are.
ANALYSIS
Summary judgment is proper when the record reflects there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Kentucky Rule of Civil Procedure (CR) 56.03. Summary judgment is intended to expedite the disposition of cases presenting solely issues of law. Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 480 (Ky. 1991). For those seeking summary judgment based on a qualified official immunity defense, "[s]ummary judgments play an especially important role" as the defense renders one immune not just from liability, but also from suit itself. Rowan Cty. v. Sloas, 201 S.W.3d 469, 474 (Ky. 2006) (citing Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ). The issue of school officials' entitlement to qualified official immunity is a matter of law which we review de novo. Patton v. Bickford, 529 S.W.3d 717, 723 (Ky. 2016).
I. The School Officials Are Entitled to Qualified Immunity For Discretionary Acts.
In Williams v. Kentucky Department of Education, this Court explained that a "special relationship" is formed between a Kentucky school district and its students compelled to attend school such that there is "an affirmative duty on the district, its faculty, and its administrators to take all reasonable steps to prevent foreseeable harm to its students." 113 S.W.3d 145, 148 (Ky. 2003) (citations omitted). Under this general duty to protect students within their custodial control, the Breathitt County school officials have more specific duties imposed by KRS 161.180 and Breathitt County School Policy 09.221 to supervise the students and by KRS 620.030 to report abuse and neglect. Doe alleges the school officials breached the duties imposed by these statutes and school policy. In response to the school officials' contention that their alleged negligent conduct was discretionary in nature and, therefore, they are immune from *831 suit,[13] Doe argues that the challenged conduct was ministerial in nature and not subject to the discretionary function exception.
Yanero v. Davis, 65 S.W.3d 510 (Ky. 2001), provides the framework for deciding whether a public officer or employee is afforded immunity from tort liability. When a public officer or employee is sued in his or her individual capacity, that officer or employee may enjoy qualified official immunity "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." Id. at 522 (citing 63C Am. Jur. 2d Public Officers and Employees § 309 (1997) ). Consequently, the type of act performed will determine if the qualified official immunity defense applies. Id. at 521 (citing Salyer v. Patrick, 874 F.2d 374 (6th Cir. 1989) ). The defense applies to the negligent performance of "(1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." Id. at 522 (internal citation omitted). It does not apply to "the negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." Id. (citing Franklin Cty. v. Malone, 957 S.W.2d 195, 201 (Ky. 1997) ). Our inquiry thus turns to whether the school officials' challenged conduct is discretionary or ministerial.
II. The School Officials' Duty to Supervise Was a Discretionary Act.
Doe alleges she was harmed by the school officials' failure to supervise her and that failure lead to her abuse by Mitchell. As described above, the text communications and sexual acts between Mitchell and Doe occurred over the course of approximately two years, from the beginning of her freshman year until April of her sophomore year. Within that span, the sexual acts occurred only during Doe's time as a freshman at Sebastian Middle School, August 2009 to May 2010, when she left the morning meeting area to go to Mitchell's classroom. Consequently, the duty to supervise analysis is limited to this time frame.
Kentucky school administrators are required by statute to "hold pupils to a strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities." KRS 161.180.[14] Breathitt County School System Policy 09.221, titled "Supervision of Students," citing KRS 161.180, likewise provides that "[e]ach teacher and administrator shall hold pupils to a strict account for their conduct on the premises, on the way to and from school, and on school sponsored trips and activities." That policy also states that "[s]tudents will be under the supervision of a qualified adult." Nevertheless, Doe left the supervised morning meeting area and went to Mitchell's classroom without anyone asking where she was going.
*832 The Court of Appeals, considering Marson v. Thomason, 438 S.W.3d 292 (Ky. 2014), concluded that Policy 09.221, along with Policy 09.221 AP.1,[15] contained only general supervisory duties regarding students rather than specific ones and, consequently, the school officials were entitled to qualified immunity. In Marson, we addressed whether the principal was entitled to qualified immunity when a child fell off a set of bleachers which were not properly extended. Having observed that principals have a "duty to provide a safe school environment, but they are not insurers of children's safety[,]" we held that the principal was entitled to immunity because she "did not have the specific duty to extend the bleachers properly, nor did she choose to undertake that duty." 438 S.W.3d at 299.
Like the general duty in Marson to provide a safe school environment, the duty in KRS 161.180(1), Policy 09.221, and Policy 09.221 AP.1 to provide student supervision "is a discretionary function for [school officials] exercised most often by establishing and implementing [supervision] policies and procedures," which is qualitatively different from actually supervising the students, a ministerial duty for those who are assigned such supervision. Marson, 438 S.W.3d at 299, 302. Doe has not alleged that any of the school officials were assigned as supervisors of the meeting area she left to go to Mitchell's classroom or that the school officials passed her in the halls on those occasions. Simply put, they were not actually involved in active supervision of the students at the times relevant to Doe's complaint. Consequently, the school officials only had a general supervisory duty over Doe. We agree with the Court of Appeals that Marson resolves the question in favor of the school officials as to whether they are entitled to qualified immunity as to Doe's supervision, or the lack thereof, when she left the morning meeting area and met Mitchell in his classroom.
Doe contends that the Court of Appeals' application of Marson is not appropriate here because school officials presented with evidence of a teacher's inappropriate conduct[16] - without an explicit duty to protect a student from a predatory teacher and with school boards being unlikely to promulgate such specific regulations - will be entitled to immunity, unlike the teachers assigned to monitor the halls. We do not disagree that "supervision of student" policies like Policy 09.221 are unlikely to make a school administrator or official liable for a student's harm unless that official engages in the actual supervision. See Patton, 529 S.W.3d at 727. Nevertheless, we fail to see how the principles recognized in Marson for administration of school safety policy, a discretionary function, do not apply here as well for student supervision. Furthermore, even if the discretionary nature of the supervisory duty provides school officials with immunity, in the case of officials presented with clear evidence of a teacher's inappropriate, abusive behavior - the scenario posited - reasonable cause would exist to require reporting the abusive teacher pursuant to KRS 620.030, as discussed below. In short, *833 school officials who did nothing under those facts would not be entitled to immunity.
Finally, Doe argues that even if the school officials' duty to supervise is discretionary, the Court of Appeals failed to consider two school policies which imposed specific duties upon school officials. Doe maintains Appellees were required to take action and report Mitchell's violations of Policy 03.1325,[17] titled "Disrupting the Educational Process," and Policy 03.162,[18] titled "Harassment/Discrimination." However, Doe did not advance these specific policy arguments in the courts below.
In her response to the school officials' summary judgment motion, Doe asserted that the officials violated school policy. After making a general statement that "[s]chool policies prohibit the exact conduct that Mitchell engaged in with Jane Doe," Doe used a footnote to direct the trial court to the attached Breathitt County Board of Education Policies. Doe stated that "All pertinent portions of Breathitt County School Policies, that are referenced herein are attached hereto, collectively compiled as Exhibit 8 for the Court's review." This exhibit includes copies of 27 different policies, the majority of which, including Policy 03.1325, were not directly referenced by Doe.
After citing Policy 01.5 which states all school board policies are binding on employees of the district, Doe simply stated,
The [policies] also set forth mandatory reporting requirements for actual or suspected abuse [or] neglect which are found in sections 3.162 (Employees who believe they or any other employee, student, or visitor is being subject to harassment/discrimination shall, as soon as reasonably practicable, report it); 9.227 (Within twenty-four (24) hours of receiving a serious allegation of harassment/discrimination, District personnel shall attempt to notify parents of both student victims and students who have student victims and students who have been accused of harassment / discrimination.).
(Emphasis in original).
Citing other statutes incorporated into the school board policies and another *834 school policy administrative procedure, 09.42811AP.21, Doe argued that "Important to this Response is that students must always be supervised by a qualified adult," quoting the text of Policy 09.221. In her argument that the failure to report was a violation of a ministerial duty imposed by Kentucky law and the Board's adopted rules, Doe never mentioned specific Breathitt County School policies. She made general statements that the requirement to report sex abuse is mandatory and the duty to report is mandated by Kentucky law and the Breathitt County Board of Education Policies, but Doe made no substantive arguments regarding either Policy 03.1325 or Policy 03.162.[19]
"An appellate court may decide only those issues which were fully presented to the trial court." Commonwealth v. Smith, 542 S.W.3d 276, 285 (Ky. 2018) (citation omitted). An approach otherwise "would be a grossly inefficient use of the time and resources of the parties and of trial courts and would be a disincentive for attorneys to comply with their duty thoroughly and timely to determine the legal [issues] ... at the infancy of litigation." Harrison v. Leach, 323 S.W.3d 702, 709 (Ky. 2010) (citation omitted).
Although the trial court entered summary judgment in Doe's favor, we cannot view the judgment as a ruling in Doe's favor on the claim that Policies 03.162 and 03.1325 created ministerial duties when she made no substantive argument specifically presenting those claims to the trial court. Attaching regulations to a response does not suffice. Cf. Commonwealth v. Andrews, 448 S.W.3d 773, 776 (Ky. 2014) ("having prevailed at the trial court (where the issue was raised [and the statute was specifically addressed by the trial court] ) ), the Commonwealth had no reason to attack the trial court's application of the statute before the Court of Appeals." (Emphasis supplied) ).
Without preservation of the argument regarding Policies 03.162 and 03.1325, Doe's claim of error is not properly before this Court and may not be reviewed. Turner v. Commonwealth, 460 S.W.2d 345, 346 (Ky. 1970) (citations omitted). Doe did not argue their applicability before the trial court and her argument was thus not properly before the Court of Appeals. Consequently, the Court of Appeals did not fail in its review by not addressing her non-specific arguments related to Policy 03.162 and Policy 03.1325. In any event, even if these arguments had been preserved, the record before us contains no facts regarding Doe's relationship with Mitchell that would implicate either of these policies. School officials had no reasonable cause to believe any disruptive behavior or harassment was occurring or to report such misconduct until after Mitchell's relationship with Doe had ended.
III. The Duty to Report Can Have Both Discretionary and Ministerial Elements Depending on the Facts.
*835 Next, Doe alleges she was harmed when the four named Breathitt County school officials failed to report the abuse of Betty and Cindy as required by Kentucky statute. Doe claims that the school officials' failure to report these incidents involving other students allowed Mitchell to continue abusing her. Although Doe refers to the school officials' knowledge of Mitchell's texting conduct with both Betty (revealed in May 2010) and Cindy (revealed in May 2011), the analysis of this second issue is necessarily limited to the knowledge school officials gained from their investigation of Mitchell's texts to Betty, i.e., the May 2010 incident.[20] As discussed, in May 2010, Betty's parents expressed their concern to Turner and Hamilton about numerous texts from Mitchell to their daughter. The uncovered texts were about school, guitar lessons and to some extent another student's boyfriend; even though the excessive texting was troublesome there was nothing sexual in nature.[21] An investigation by school officials resulted in Mitchell's ten-day suspension during the summer of 2010. The following school year, Mitchell and Doe did not have sexual relations, but they did exchange sexually explicit texts between August 30, 2010, and April 4, 2011. Thus, the May 2010 incident is potentially relevant to Doe's alleged harm from the sexual texting during her sophomore year, but not the physical sexual encounters, which had ended by that point.
Although Doe alleges she was also harmed by the school officials' failure to report Mitchell's abuse of Cindy, the school officials did not receive notice of the inappropriate texts to Cindy until May 2011. By that point the sexual texting between Mitchell and Doe had stopped. Consequently, failure to report the May 2011 incident has no bearing on Doe's alleged harm. Our analysis of the school officials' entitlement to qualified official immunity is thus properly limited to the question of the duty to report following the May 2010 incident involving Betty.[22]
KRS 620.030, the mandatory reporting statute, provides in relevant part:
(1) Any person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused[23] shall immediately cause *836 an oral or written report to be made to a local law enforcement agency or the Department of Kentucky State Police; the cabinet or its designated representative; the Commonwealth's attorney or the county attorney; by telephone or otherwise. Any supervisor who receives from an employee a report of suspected dependency, neglect, or abuse shall promptly make a report to the proper authorities for investigation.... Nothing in this section shall relieve individuals of their obligations to report.[24]
Doe asserts that since the Appellees knew Mitchell sent Betty hundreds of text messages at all hours of the night and Betty's father expressed concern that Mitchell would likely commit sexual crimes against students if his behavior was not stopped, Appellees had reasonable cause to believe that Betty was being sexually abused by Mitchell and should have reported the abuse. According to Doe, if a report had been made pursuant to KRS 620.030, it would have resulted in a law enforcement investigation, Mitchell's abuse of other students[25] likely would have been uncovered earlier and he would not have had the opportunity to engage in further sexual harassment of Doe by texting her during the period from August 2010 through April 2011. Notably, although Appellees did not make a report pursuant to KRS 620.030, Betty's father did go to the *837 Jackson Police Department to report Mitchell's texting conduct with his daughter. As noted above, Betty's father testified that the officers basically said, "Our hands are tied. There's nothing we can do about it. [Mitchell] didn't say nothing out of the way to your daughter."
As we have often recognized, it is not always easy to determine whether a public official's conduct is discretionary or ministerial in any given case. See Haney v. Monsky, 311 S.W.3d 235, 240 (Ky. 2010) ; Patton, 529 S.W.3d at 723. A careful examination of KRS 620.030 makes clear that its framework for reporting cases of suspected child abuse includes elements of both ministerial and discretionary conduct. Because "few acts are ever purely discretionary or purely ministerial," our analysis considers "the dominant nature of the act." Haney, 311 S.W.3d at 240 (emphasis in original).
Doe contends, citing Commonwealth v. Allen, 980 S.W.2d 278 (Ky. 1998), that the reporting of sexual abuse is not discretionary because under KRS 620.030, any school official who has reason to believe a child is being abused has the specific, and thus ministerial, duty to report the same to local law enforcement. Allen is factually distinguishable from this case because "during the 1992-93 school year, students reported to each of the appellees that another teacher had engaged in sexual contact with students." Id. at 279. Allen's discussion, understandably and correctly, presumes that the students' reports to a teacher and the school counselor were credible allegations of sexual abuse requiring reporting. Here, on the other hand, there were no such allegations of sexual misconduct.
Doe also rejects Turner v. Nelson, 342 S.W.3d 866 (Ky. 2011), as factually distinguishable and consequently not pertinent to analyzing the school officials' qualified official immunity under KRS 620.030. Turner, however, specifically analyzed whether a teacher was entitled to qualified official immunity when it was alleged she should have reported abuse that she had not personally observed, in that case a kindergartner touching a classmate.
The teacher in Turner asserted a qualified official immunity defense against a claim that she was required under KRS 620.030 to report children touching or abusing each other. Although the teacher had not observed any of this alleged activity, it had been reported to her by the child who was allegedly touched. This Court held: " KRS 620.030(1) only directs reporting by a 'person who knows or has reasonable cause to believe that a child is ... abused.' Thus, where there is no actual knowledge of the event, there must be an objective determination that a reasonable belief existed." Id. at 877 (citation omitted). We expressed approval of the trial court's conclusion that without one having actual or personal knowledge of abuse, the ultimate determination of whether reasonable cause exists involves reasonable inquiry into the facts, weighing credibility of witnesses, and then using judgment and experience to reach a decision. Id. at 877-78. Recognizing that these actions were clearly discretionary in nature, we held the kindergarten teacher in Turner was entitled to qualified official immunity. Id. at 878.
In Patton v. Bickford, this Court recently compared a teacher's duty to report bullying (where teasing, mocking and certain physical conduct such as pinching, twisting body parts, punching and grabbing were specifically identified in the school policy as bullying) with the teacher's duty in Turner to report suspected sexual abuse. We recognized that there are both ministerial and discretionary components to the duty to report.
*838 529 S.W.3d at 728. In Patton, we described the duty to report suspected abuse in Turner as a "ministerial duty of making a binary decision to report the incident or not," but determined that the exercise of discretion to assess whether the alleged actions of the five-year old student could even qualify as sexual abuse was dominant over the ministerial duty to report. Id. By contrast, the alleged actions of the middle schoolers in Patton included conduct specifically identified in the school policy as "bullying." Under those circumstances, "no discretion or judgment was required to determine if specific conduct qualified as bullying" and the teacher's duty to report was ministerial. Id.
To address the case at bar, we parse KRS 620.030 into its discretionary and ministerial functions systematically. In cases such as this where the alleged abuse was not actually observed by the officials who allegedly failed to report, KRS 620.030 first requires a baseline determination - is there "reasonable cause" to believe abuse has occurred or is occurring? To make that decision, the official must do some investigation after a potential issue of abuse is brought to his or her attention; the requirement to investigate, to ascertain the facts, is plainly a ministerial function. Assessing the information gathered from the investigation and making the actual determination of whether reasonable cause exists to believe abuse is occurring or has occurred, on the other hand, requires personal judgment, a discretionary function. Consequently, under the statute, no further action is required when one investigates and concludes there is no reasonable cause to believe that a child is being or has been abused. However, when one investigates and concludes reasonable cause exists, the report to a proper authority pursuant to KRS 620.030 is mandatory. The dominant act in cases where the alleged abuse is not actually observed (or otherwise known with reasonable certainty) and an investigation is required to determine reasonable cause is discretionary.[26]
In this case, Superintendent Turner conducted an investigation involving Mitchell's texting with Betty.[27] He spoke with Betty's parents, who had Betty's phone, and he spoke with Mitchell. He learned that the texts between Betty and Mitchell were about school, guitar lessons, and another student's relationship with her boyfriend. The investigation revealed that Mitchell inappropriately sent text messages to Betty, and Mitchell was reprimanded. Turner, however, did not report Mitchell under KRS 630.020 as someone he had reasonable cause to believe was abusing Betty.
Doe contends that Turner was required to report Mitchell to authorities for sexual abuse because (1) he testified in his deposition that he initially thought the texts between Mitchell and Betty may have been of a sexual nature and (2) Betty's father expressed Concern that Mitchell would commit or may have already committed sexual crimes against students. That information, as well as Betty's parents seeing the texts sent to her, none of which were sexual, and Betty's mother sending text messages to Mitchell posing as Betty and *839 not receiving inappropriate messages in response, was before Turner to weigh in assessing whether reasonable cause existed to believe Mitchell sexually abused Betty. We agree with the Court of Appeals that KRS 620.030 's reporting requirement involves a discretionary action when a school official or other individual is determining whether there is "reasonable cause to believe" that a child has been or is being abused. Disagreement as to the determination reached by the school officials in the good faith exercise of their judgment will not expose the school officials to personal liability. In sum, Appellees are entitled to qualified immunity as to Doe's claims regarding their failure to report Mitchell in 2010 after becoming aware of his texting relationship with Betty.[28] ,[29]
IV. The Failure to Obtain Transcripts of the Texts Between Betty and Mitchell Did Not Constitute Violation of a Ministerial Duty That Destroyed Qualified Official Immunity.
In the Court of Appeals, the sole issues clearly presented and addressed were whether, in the context of Doe's claims, the school officials' duty to supervise and duty to report were discretionary. The Court of Appeals rejected Doe's arguments that those duties were ministerial and found, as we do, that the duties were discretionary, entitling the school officials to qualified immunity. Doe now asks this Court to find a ministerial duty arising from the school officials' response in May 2010 to the Betty texting incident. Doe argues that while creating the 2010 improvement plan for Mitchell was discretionary, the implementation of the plan was ministerial, and the officials breached a ministerial duty to Jane Doe when they did not follow through and obtain all of the requested transcripts of text messages between Mitchell and Betty.[30] This alleged ministerial duty to Doe has been rather free-floating as the case has made its way through the courts, with Doe changing her position on its relevance to her respective causes of action. We thus question whether this argument is properly preserved but in the interest of fully disposing of any suggestion that a ministerial duty lurking in the record destroys qualified immunity as to Doe's claims, we will address it.
Before the Court of Appeals, Doe mentioned the text transcript point (without elaboration) as part of the duty to report, essentially arguing that if officials had pursued the transcripts they would have found sexual messages between Mitchell and other students and would have been required to report Mitchell. We note that this argument overlooks the undisputed fact that Mitchell was not asked to turn over his phone or produce transcripts of all text messages with students but rather was asked to produce transcripts of any texts with Betty in the two months preceding her parents' contacting school officials. Betty's parents had access to her *840 phone and saw no sexual texts, and there was no evidence of sexual texting with the other two students whose interactions with Mitchell were documented at the time by school officials following conversations with them and their mothers. The appellate court apparently did not view the absence of follow-through on the Mitchell/Betty transcripts as changing the predominantly discretionary nature of an investigation to determine whether there was "reasonable cause to believe" sexual abuse was occurring. Nor do we.
If an official engages in a good faith investigation regarding excessive texting between a teacher and student, meets or talks with the affected students and their parents, is informed by the students and parents (at least some of whom have seen the texts) that there have been no sexual texts exchanged and then orally requests, but never obtains, documentation of the text messages for school records, that does not turn a discretionary act - investigation of potential abuse - into a ministerial act. By way of example, if an official conducts an investigation regarding abuse, theft or any form of misconduct and decides that the investigation will consist of interviewing five specific witnesses, obtaining three days of security videotapes and checking three days of "sign-in sheets," the failure to interview one of the originally intended witnesses or to obtain some of the videotape does not mean the official has breached a ministerial duty that destroys qualified immunity. Part of the discretionary nature of an investigation is deciding how to investigate and when there is enough information to conclude the investigation. Additionally, even if missing a step in the intended plan could be deemed breach of a ministerial duty, there is no basis in our current law for concluding that misstep was a breach of a duty owed to a totally different student (or prison inmate, state employee, etc.) who was or had been the victim of similar abuse, theft or misconduct, whatever the circumstances might be.
Moreover, Doe's argument would elevate an oral directive at the conclusion of an investigation into a ministerial duty, and there is no precedent for that approach in our case law. Typically, as discussed with the duties to supervise and report, a duty arises from statutes, regulations or official policies, although we have on occasion (in three cases) addressed a duty that was not in writing.
In Yanero this Court stated
an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain and imperative, involving merely execution of a specific act arising from fixed and designated facts.
65 S.W.3d at 522. In that case, we found the common law "duty to exercise that degree of care that ordinarily prudent teachers or coaches engaged in the supervision of students of like age as the plaintiff would exercise under similar circumstances," required the coach to enforce the known rule, based on custom and practice, that student athletes wear helmets during batting practice. Id. at 529. Because the rule was an absolute, certain, and imperative part of baseball practice safety, the coach breached a ministerial duty.
In Haney, 311 S.W.3d 235, we addressed a case involving a child who broke his shoulder while hiking during a Louisville Zoo summer camp. The child's parent argued that the training the counselor received from the camp for conducting the hiking activity was sufficiently comprehensive, detailed, and definite to make the supervision a ministerial duty, "absolute, *841 certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts" so as to constrain her "exercise of discretion and judgment." Id. at 242.
In finding the duty was not ministerial, this Court stated:
When it came to ensuring the safe participation of the children in the Night Hike activity, Haney's training was largely silent on the matter and, to the extent that she was offered relevant instruction, it was broadly defined and not mandatory. Where her training and instruction were silent, her duties ... were those generally imposed to exercise reasonable care under the circumstances. Taken alone, we do not believe those duties to be ministerial in nature and, indeed, should not be, lest we transform all general duties into ministerial acts and functions, thus eviscerating the doctrine of qualified official immunity. In this respect, it is worth remembering that a motivating policy of qualified official immunity is that officials who happen to be charged with duties that call for the exercise of their judgment and discretion should not be held personally liable to an individual for damages because such a result would "deter independent action and impair the effective performance of their duties."
Id. at 245 (citation omitted).
A common law duty may be ministerial if it is "specific and affirmative in its command." Id. (citing Com., Transp. Cabinet, Dept. of Highways v. Sexton, 256 S.W.3d 29, 33 (Ky. 2008) ). As we emphasized in Haney, no matter the source, a duty is not considered ministerial unless there is an "absolute, certain, and imperative obligation ... such that it requires only obedience or merely execution of a specific act from fixed and designated facts." Id. (internal quotation marks and citation omitted).
Most recently, in Gaither v. Justice & Public Safety Cabinet, 447 S.W.3d 628 (Ky. 2014), a confidential informant, utilized by law enforcement for another drug buy after his identity had been compromised, was murdered by a drug dealer. We concluded that the police officers' clear and certain imperative to follow the known rule to not use such a compromised informant in another buy/bust operation created a ministerial duty despite the lack of a specific written directive or administrative regulation for the officers to follow. Id. at 635. However, as to the officer-created ground rule that they would intercede if the informant entered the drug dealer's car during the buy/bust, we concluded that the officers' decision to not intercede immediately after the buy/bust went awry was a discretionary act. Id. at 634. Under the facts in Gaither, "[i]t [was] not immediately apparent that prudence mandated a prescribed 'absolute, certain, and imperative' course of action" when the informant got into the drug dealer's car. Id.
Yanero and Gaither illustrate the Court's recognition of a widely accepted, albeit unwritten, rule - youth must wear batting helmets during batting practice, confidential informants must be retired when their identity has become known - as the source of a ministerial duty. Haney reflects that even detailed training regarding the safety of young campers is not necessarily specific enough to give rise to a ministerial duty with respect to how to conduct a particular type of hiking activity. Further, all three cases illustrate that where the alleged ministerial duty is not found in a statute, regulation, written policy, or even common law, see Haney, 311 S.W.3d at 245, there must be a widely accepted rule or practice that is known to all in that field and mandated in the circumstances.
*842 Those criteria plainly do not apply to Doe's allegations in this case. No rules existed that required school officials to obtain the transcripts of the exchanged text messages (assuming they were even obtainable for the requested period), and one official's request that they be obtained, whether as an additional, last step of the investigation or simply to document that there were no sexual messages exchanged, did not convert the discretionary duty to investigate into a ministerial duty. As Justice Scott observed in Haney, this Court should not eviscerate qualified immunity by transforming general duties such as the duty to supervise safety (or, in this case, to conduct a good faith investigation into potential teacher misconduct) into a ministerial duty.
Finally, we turn to Doe's effort to make the lack of follow-up on the Mitchell/Betty text transcripts part of her negligent retention claim. To succeed on a negligent hiring and retention claim, the plaintiff must prove (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff. Oakley v. Flor-Shin, Inc., 964 S.W.2d 438, 442 (Ky. App. 1998). As in any negligence case, it is necessary to show that the defendant failed to discharge a legal duty owed to the plaintiff. Mitchell v. Hadl, 816 S.W.2d 183, 185 (Ky. 1991) (citation omitted).
Here, the school officials had a common law duty to use reasonable care in making their decision regarding disciplining, dismissing or retaining Mitchell. Ten Broeck Dupont, Inc. v. Brooks, 283 S.W.3d 705, 732 (Ky. 2009). That decision is inherently a discretionary function, and as with a good faith investigation conducted in determining whether there was a duty to report, there is no ministerial duty created by the superintendent's eleventh-hour oral request for the transcripts of text messages between Mitchell and Betty. Even if we assume that this specific request could create a free-standing ministerial duty of some sort (which would be inconsistent with our case law regarding the source of duties relevant to qualified immunity), it is unclear how this duty was owed to anyone other than Betty and perhaps her parents. Doe essentially asks us to find this specific duty extended to every student in the middle school. While a duty to investigate potential abuse may be owed to students generally (either for purposes of mandatory reporting or to make an employment decision) that, again, is a predominantly discretionary action, not a ministerial act.
Lastly, Doe urges us to follow the lead of two out-of-state cases where school officials were denied qualified official immunity. Even a casual examination of those cases reveals critical distinctions from this case, including the fact that in both cases the school officials had prior knowledge of sexual misconduct yet returned the teacher to the classroom. In Doe v. Cedar Rapids Community School District, 652 N.W.2d 439, 440 (Iowa 2002), an elementary school music teacher, Lindsey, had "a long history of allegations of misconduct" stretching back nineteen years, including an improper touching of a fifth-grade girl in 1964 and various inappropriate behaviors, including touching, with another fifth grader in 1990. Lindsey had been fired by one school district in the middle of the school year due to misconduct. When parents of three third grade students brought suit in 1995 alleging Lindsey engaged in sexual misconduct with their children, the Iowa Supreme Court refused to accord the officials qualified official immunity for their decision to hire and retain the offender. So-called "discretionary function immunity"
*843 is statutory in Iowa and only available if the action involves discretion and is a decision grounded in social, economic or political reasons. Their supreme court concluded the legislature did not intend it to extend to a hiring and retention decision, "a choice made by a school district to offer or not offer a position of employment within the district to a particular individual." Id. at 445. The Court analogized the decision to "a government employee's decision to turn left or right at a stop sign," and not an economic, political or policy making decision "implicating governmental functions." Id. Most tellingly, the Court stated "surely, our legislature ... did not intend to allow a school district to hire, retain, or leave unsupervised a teacher with known propensities for child abuse with total impunity." Id. at 446.
Iowa's statutory discretionary function immunity doctrine is more limited than ours and the facts of that case are totally distinct. The Breathitt County school officials in this case had no knowledge whatsoever of any abuse/sexual misconduct by Mitchell until May 2011, at the earliest, and that was after Mitchell's contact with Jane Doe had completely ended.
Similarly, Doe v. Dimovski, 336 Ill.App.3d 292, 270 Ill.Dec. 618, 783 N.E.2d 193 (2003), involved a high school teacher/varsity basketball coach alleged to have engaged in a sexual relationship with a female student over a seven-month period. As in Iowa, immunity is statutory in Illinois and limited to "policy choice(s)." Id. , 270 Ill.Dec. 618, 783 N.E.2d at 197. The named school officials had received credible reports of the teacher's earlier sexual misconduct with another student - reports from that student and her mother - but that misconduct was never investigated, at least not thoroughly, no action was taken to discipline the teacher and no report was ever filed. He continued to teach and coach. The Illinois appellate court held once those officials had reason to suspect or should have suspected that a child was being sexually abused they had no discretion not to report it. Needless to say, the law is the same in Kentucky. The Illinois court stated that "reasonable cause to report" suspected abuse "is determined by the objective belief of a reasonable person, not the school personnel's subjective belief." Id. 270 Ill.Dec. 618, 783 N.E.2d at 198. Finally, the court contrasted the case before it with an earlier case "when the rumors of sexual abuse were denied by the plaintiffs themselves" and "there was no reason to suspect sexual misconduct." Id.
In this case, a thorough investigation was conducted when Mitchell's texting with Betty was revealed (including conversations with other students and parents) and there was never any hint of sexual misconduct, just excessive texting between a teacher and student, texting that sometimes did not relate to the academic team, school assignments or other appropriate subjects, but never sexual texts.
Neither of the foregoing cases causes us to re-examine our conclusions about the qualified official immunity applicable in this case. Our immunity law is different from the statutes in Iowa and Illinois, and, equally significantly those cases involved denying immunity to officials who hired or rehired a known or suspected sex offender. That is plainly not this case.
V. Doe Fails to Show the Officials Acted in Bad Faith.
Doe asserts that even if supervising students and investigating/reporting abuse were all discretionary acts, the school officials are not immune from suit because they acted in bad faith.
[B]ad faith can be predicated on a violation of a [causally related] constitutional, statutory, or other clearly established *844 right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position ... or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.
Sloas, 201 S.W.3d at 475 (quoting Yanero, 65 S.W.3d at 523 ). Doe has the burden to show that the school officials were not acting in good faith. Yanero, 65 S.W.3d at 523.
Doe states that the school officials' failure to follow through with their own plan is evidence of their objective unreasonableness and evidence of their lack of faithfulness to their duty. As to the objective reasonableness test, Doe has not met her burden to show a violation of a constitutional, statutory, or other clearly established right. Doe also does not show that the school officials willfully or maliciously intended to harm her or acted with a corrupt motive. Like the Court of Appeals, we cannot conclude that the school officials acted in bad faith so as to deprive them of qualified official immunity.
VI. The Cloverdell Teacher Protection Act Need Not Be Addressed Given the Applicability of Qualified Official Immunity.
Finally, the school officials also argued before the Court of Appeals that the Paul D. Coverdell Teacher Protection Act afforded them immunity from Appellants' simple negligence claims. Under this federal law, "no teacher, administrator, or individual member of a school board is liable for harm to a student if he was acting within his scope of employment, and the actions complied with the law and were in an effort to discipline a student or maintain control." Dennis v. Bd. of Educ., 21 F.Supp.3d 497, 502 (D. Md. 2014) (citations omitted). Having disposed of this interlocutory appeal on state qualified immunity grounds, the Court of Appeals declined to consider this argument. We similarly decline to address it here.
CONCLUSION
For the foregoing reasons, the Court of Appeals' decision reversing the summary judgment denying the Appellees qualified official immunity in this action is affirmed. The case is remanded to the Breathitt Circuit Court for further proceedings consistent with this Opinion.
All sitting. Minton, C.J.; Cunningham, VanMeter, Venters, and Wright, JJ., concur. Keller, J., concurs in part and dissents in part by separate opinion.

Pseudonyms are employed for the juveniles involved in this case to preserve their privacy to the greatest extent possible.

Sebastian Middle School was for students in seventh through ninth grade, so Doe was still a middle school student.

Mitchell and Betty used their personal cell phones.

Betty's mother took the billing summary, available online, reflecting Betty and Mitchell's texting history to the meeting.

Although Doe describes Mitchell's texts as containing remarks about Betty's relationship with her boyfriend, the notes taken by Turner's administrative assistant indicate that Betty's parents reported that the comments were about another student and that student's boyfriend. Betty's parents never indicated otherwise. Mitchell's written statement for the school's file also indicated that the relationship comments were about another student and that student's boyfriend.

Turner also asked Betty's parents to let him know if Mitchell texted Betty further. The record reflects no texting between Mitchell and Betty after Turner's intervention.

An improvement plan is created at the beginning of each school year for each teacher. Along with other conventional goals such as improving test scores, to address Mitchell's inappropriate texting, his improvement plan, provided by Hamilton, required him to review the Kentucky Professional Code of Ethics and the District Technology Acceptable Use policies.

Mitchell testified in his first deposition that he attempted to get the text records the next day after being asked. He stated that he contacted his cell phone company several times and tried to obtain the records. After contacting the company, he told Hamilton that he was working on getting the records; he did not inform Hamilton that the company said it would take a while. In a later deposition, Mitchell stated that the phone company told him that they could not do anything unless it was court ordered. At some point, Mitchell quit attempting to get the records and they were never obtained. Mitchell testified Hamilton contacted him ten to twelve times over that year about getting the records.
Notably, Turner also asked Betty's parents to get the text messages through her phone company, and they were unable to get them. Betty's parents provided billing records from May 1 through May 14, 2010, the time Betty was in possession of her new phone. On Monday, May 17, Betty's parents met with school officials. Hamilton testified that he did not know if the messages between Mitchell and Betty would have still been stored in the phone company's archives at that point; he was later told the phone company only archives actual text messages for a short period of time. In terms of seeking police help in getting the records, Hamilton testified that Turner related to him that Betty's parents attempted through the police to get a copy but could not get the text messages. Turner testified that a police officer informed him that it is almost impossible to get records of actual text messages.

Turner testified he did not instruct Hamilton to write this letter. According to Turner, he first learned of the letter during his 2013 deposition. However, Hamilton testified that after Mitchell indicated he could not get the detailed documentation of the texts as Turner requested, Turner asked Hamilton to type up the letter.

The charge against Bowling was dismissed.

Stipulated facts adopted by the district court included the following:
It was the opinion of the school employees that there was not sufficient information to believe that there was any abuse, neglect or dependency.
[The school board attorney] reviewed the screen shot information and discussed the investigation with the school administrators.
It was [the school board attorney's] opinion that at that time that the school did not have sufficient grounds to require a report of the alleged incident to Social Services, KSP, or any other authority.
The school board attorney referred to in these stipulations also served as Assistant Commonwealth Attorney.

Although identified in the complaint as a Breathitt County School assistant superintendent, as described above, Bowling was a teacher at Sebastian Middle School.

Qualified official immunity applies to statutory actions under KRS 446.070. Clevinger v. Bd. of Educ., 789 S.W.2d 5 (Ky. 1990).

KRS 161.180(1) states in full:
Each teacher and administrator in the public schools shall in accordance with the rules, regulations, and bylaws of the board of education made and adopted pursuant to KRS 160.290 for the conduct of pupils, hold pupils to a strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities.

Policy 09.221 AP.1 states:
Principals shall develop and implement a plan of supervision for their schools to address the following areas: 1. Bus loading and unloading; 2. Meals; 3. Halls, restrooms, and playgrounds; 4. Time before and after the school day; and 5. Field trips and other school activities. Prior to the opening of school each year, the Principal shall submit the plan to the Superintendent/designee for review and to the Board for its approval.

To reiterate, school officials were unaware of Mitchell's texting conduct or any other concerns in the time frame when Jane Doe was meeting Mitchell in his classroom.

Policy 03.1325 states:
Any employee who participates in or encourages activities that disrupt the educational process, whether on school property or at school-sponsored events and activities, may be subject to disciplinary action, including termination of contract.
For purposes of this section, behavior which disrupts the educational process shall include, but not be limited to:
1. Conduct that threatens the health, safety, or welfare of others;
2. Conduct that may damage public or private property, including the property of students or staff;
3. Illegal activity;
4. Conduct that interferes with a student's access to educational opportunities or programs, including ability to attend, participate in, and benefit from instructional and extracurricular activities; or
5. Conduct that disrupts delivery of instructional services or interferes with the orderly administration of the school and school related activities or District operations.

Policy 03.162 provides in part: "Employees who believe they or any other employee, student, or visitor is being or has been subjected to harassment/discrimination shall, as soon as reasonably practicable, report it."
Policy 03.162 defines harassment/discrimination of employees as:
unlawful behavior based on the race, color, national origin, age, religion, sex, genetic information or disability of an employee involving intimidation by threats of or actual physical violence, the creation, by whatever means, of a climate of hostility or intimidation, or the use of language, conduct, or symbols in such a manner as to be commonly understood to convey hatred or prejudice.

Doe's Court of Appeals' brief was very similar. In the statement of the case, however, when Doe stated that the Board policies set forth mandatory reporting requirements for actual or suspected abuse or neglect, a footnote directed the court to the appendix for Policy 03.162 and Policy 09.227. Policy 03.1325 was never mentioned, although as with the summary judgment response, it was part of the appendix containing Breathitt County Board of Education Policies.
Before this Court, beyond stating that the Court of Appeals failed to recognize Policies 03.1325 and 03.162, Doe merely references these policies through a footnote citing to the record, not to the specific policy, to support her statement that specific school policies require teachers and administrators to hold pupils to a strict account for their conduct and to also act when alerted to prohibited conduct.

The dissent suggests that the school officials had knowledge that Mitchell was having excessive communications with other female students. At the point when the texting with Betty came to light, there were no other allegations that Mitchell was excessively texting with other female students. See discussion of investigation pp. 3-4 supra.
The dissent also states, without citation, that the excessive texting violated "school ethics and policy." Even though Turner generally found Mitchell's texting to be inappropriate and reprimanded him, we note that no issue was ever raised about the excessive texting with Betty being violative of "school ethics and policy." Because Mitchell and Betty used their personal cellphones/devices, Turner stated in deposition testimony that the District's Technology Use policy, applicable to school resources, would not apply here.

As noted above, Mitchell was supposed to produce all texts he had exchanged with Betty. Although Hamilton repeatedly requested the transcripts, those texts were never produced, even after this lawsuit was filed. Thus, there is no evidence of record that Mitchell's texts with Betty were ever sexual in nature.

The dissent suggests that the majority's definition of abuse is too narrow because it only considers the physical sexual abuse. However, no one questions that Doe experienced harm from the inappropriate sexual texting. The relevant question is whether the officials knew or had reasonable cause to believe that Mitchell was being abusive.

KRS 600.020 defines an abused or neglected child, emotional injury, and sexual abuse as follows:
(1) "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when:
(a) His or her parent, guardian, person in a position of authority or special trust, as defined in KRS 532.045 [as a position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the minor], or other person exercising custodial control or supervision of the child:
1. Inflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means;
2. Creates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means;
....
5. Commits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon the child;
6. Creates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child;
....
(26) "Emotional injury" means an injury to the mental or psychological capacity or emotional stability of a child as evidenced by a substantial and observable impairment in the child's ability to function within a normal range of performance and behavior with due regard to his or her age, development, culture, and environment as testified to by a qualified mental health professional;
....
(61) "Sexual abuse" includes but is not necessarily limited to any contacts or interactions in which the parent, guardian, person in a position of authority or special trust, as defined in KRS 532.045, or other person having custodial control or supervision of the child or responsibility for his or her welfare, uses or allows, permits, or encourages the use of the child for the purposes of the sexual stimulation of the perpetrator or another person[.]

Similarly, Breathitt County School Policy 09.227 pertinently states:
Any teacher, school administrator, or other school personnel who knows or has reasonable cause to believe that a child under age eighteen (18) is dependent, abused or neglected shall immediately make a report to a local law enforcement agency or the Kentucky State Police, the Cabinet for Families and Children or its designated representative, the Commonwealth's Attorney or the County Attorney in accordance with KRS 620.030.... After making the report, the employee shall notify the Principal of the suspected abuse, who then shall also promptly make a report to the proper authorities for investigation. (footnotes omitted.)

It appears from the record that up to this point Doe was the only student with whom Mitchell had exchanged sexual texts.

As noted in Yanero and emphasized in subsequent decisions of this Court, the qualified official immunity defense requires the official to act in good faith. 65 S.W.3d at 522. An official who conducts an investigation without good faith, for example a perfunctory investigation in an attempt to cover up, is not entitled to immunity even though the act is discretionary.

As discussed above, this also included talking to two other students and their mothers about those students' texting exchanges with Mitchell.

The Court of Appeals rejected Doe's claim that the Appellees acted in bad faith and were thus not entitled to the protection of qualified immunity. Applying the objective reasonableness test adopted in Yanero and Sloas, 201 S.W.3d at 481-82, the Court of Appeals found that there was no evidence to suggest that the Appellees acted in bad faith, i.e., willfully violated Doe's clearly established rights, when they did not report Mitchell's inappropriate texting with Betty. We agree, as discussed more fully below.

We note that although Appellees were eventually charged with failure to report Cindy's abuse, the record does not indicate that Appellees were ever charged with failure to report Betty's abuse.

The request for the text message transcripts was never a part of the improvement plan, as Doe alleges. See n. 7.