Joe MARSON; Carolyn Martin; and Eddie Hamilton, Appellants

v.

Sherry THOMASON, Individually; Roger Thomason, Individually; And Roger Thomason, As Next Friend Of Anthony Thomason, Appellees.

No. 2012–SC–000314–DG.

Supreme Court of Kentucky.

April 17, 2014.

Rehearing Denied Sept. 18, 2014.

Michael J. Schmitt, Jonathan C. Shaw, Porter, Schmitt, Banks & Baldwin, Paintsville, KY, Counsel for Appellants.

Glenn Martin Hammond, Glenn Martin Hammond Law Office PLLC, Pikeville, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellees, Sherry and Roger Thomason, individually and as next friend of Anthony Thomason, a minor, sued the Appellants, Joe Marson, Carolyn Martin, and Eddie Hamilton for injuries Anthony sustained in a fall from the bleachers at South Floyd Middle School. The Thomasons alleged negligence claims against the Appellants, who were principals at South Floyd High and Middle Schools and a teacher, respectively. The Appellants moved for summary judgment based on qualified immunity, which the Floyd Circuit Court denied. They then sought interlocutory review of the immunity issue in the Court of Appeals, which affirmed the trial court's denial of the motion. The Appellants sought further review in this Court. We granted discretionary review, and now affirm in part and reverse in part.

## I. Background

As a child care accommodation to parents, students at the South Floyd Middle School were allowed on campus approximately one hour before school began. Teachers supervised the children from the time they got off the bus, directing them either to the cafeteria for breakfast or to the gymnasium (shared with South Floyd High School) where students waited for classes to begin. Each grade level was assigned a particular section of the bleachers where they were to sit until school started. The students entered the gym from a walking track on the upper level, and descended the bleacher stairs to their appropriate seating area.

Anthony Thomason attended South Floyd Middle School, and at the time of his injury, was twelve years old. He is legally blind but is also prescribed corrective lenses. On September 15, 2008, Anthony followed the usual procedure to walk down the bleachers to take a seat. However, on that day, the bleachers had not been fully extended. He failed to notice this, and walked off the retracted portion of the bleachers. He fell six to eight feet to the floor, suffering injuries to his head and arm.

Anthony's parents, Sherry and Roger, filed a negligence action in Floyd Circuit Court, individually and on Anthony's behalf. The suit named Joe Marson, principal of South Floyd High School, in his individual capacity; and Carolyn Martin, principal of South Floyd Middle School, and Eddie Hamilton, a teacher at the middle school, in both their individual and official capacities.[1] The suit claimed that the Appellants knew of Anthony's disability, failed to properly supervise him, and failed to provide him with a safe environment, which resulted in his injuries.

Appellants filed a motion for summary judgment, raising issues including the defenses of governmental and qualified immunity, which the trial court denied. On appeal, the Court of Appeals affirmed in part and vacated in part, and considered other matters which are not pertinent to the case before this Court. Part of the Court of Appeals' ruling was that Appellants were entitled to assert governmental immunity in defense of the claims against

---

1. The suit also named other defendants, claims against whom were ordered dismissed by the Court of Appeals. Those claims are not part of this appeal.

them in their official capacities as school employees, and that the principals, Marson and Martin, could not be held liable on a vicarious liability theory for the negligence of the employees they supervised. Those rulings have not been further appealed.

However, the Court of Appeals also held that Appellants were not entitled to qualified governmental immunity in their individual capacities because the alleged negligence (failing to ensure the bleachers were properly extended, and inadequate supervision) consisted of a fixed, routine duty and were therefore ministerial in nature. We granted discretionary review to examine this question. Further facts will be developed below as they are necessary to the legal analysis.

## II. Analysis

■■■ This is an interlocutory appeal to review only the qualified immunity question. *Breathitt County Bd. of Educ. v. Prater,* 292 S.W.3d 883, 886 (Ky.2009). The trial court and the Court of Appeals found that the negligent acts or omissions in this case were failing to properly extend the bleachers to the proper length to be safe for use by the students, and failing to provide adequate supervision of the students as they arrived and were held in the gym before school started. Whether qualified immunity extends to the Appellants turns on whether the acts of the various defendants were discretionary or ministerial. *See Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky.2001).

■■■ The question of when a task is ministerial versus discretionary has long plagued litigants and the courts. Generally, a governmental employee can be held personally liable for negligently failing to perform or negligently performing a ministerial act. Part of the rationale for allowing this individual liability is that a governmental agent can rightfully be expected to

adequately perform the governmental function required by the type of job he does. To the extent his job requires certain and specific acts, the governmental function is thwarted when he fails to do or negligently performs the required acts. But when performance of the job allows for the governmental employee to make a judgment call, or set a policy, the fact that there is uncertainty as to what acts will best fulfill the governmental purpose has resulted in immunity being extended to those acts where the governmental employee must exercise discretion. To some extent, this says that governing cannot be a tort, but failing to properly carry out the government's commands when the acts are known and certain can be.

■■■ Stated another way, properly performing a ministerial act cannot be tortious, but negligently performing it, or negligently failing to perform it, can be. And the law provides no immunity for such acts, meaning the state employee can be sued in court. *Yanero,* 65 S.W.3d at 522. Negligently performing, or negligently failing to perform, a discretionary act cannot give rise to tort liability, because our law gives qualified immunity to those who must take the risk of acting in a discretionary manner. *Id.* at 521–22. *Whether* the employee's act is discretionary, and not ministerial, is the qualifier that must be determined before qualified immunity is granted to the governmental employee.

■■■ The distinction between ministerial and discretionary, of course, is where courts and litigants seem to have the most trouble. The decision "rests not on the status or title of the officer or employee, but on the function performed." *Id.* at 521. Indeed, most "immunity issues are resolved by examining 'the nature of the functions with which a particular official or class of officials has been lawfully entrust-

ed.'" *Id.* at 518 (quoting *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)).

At its most basic, a ministerial act is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* at 522. "That a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in nature." *Id.* (quoting *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky.1959)). And an act is not necessarily outside the ministerial realm "just because the officer performing it has some discretion with respect to the means or method to be employed." *Id; see also* 63C Am. Jur.2d *Public Officers and Employees* § 319 (updated through Feb. 2014) ("Even a ministerial act requires some discretion in its performance."). In reality, a ministerial act or function is one that the government employee must do "without regard to his or her own judgment or opinion concerning the propriety of the act to be performed." 63C Am.Jur.2d *Public Officers and Employees* § 318 (updated through Feb. 2014). In other words, if the employee has no choice but to do the act, it is ministerial.

On the other hand, a discretionary act is usually described as one calling for a "good faith judgment call[ ] made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522. It is an act "involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* Given the volume of litigation on the subject, it is clear that these definitions are not a model of clarity. No doubt, this is due to their having been written in general, somewhat sweeping terms.

But at their core, discretionary acts are those involving quasi-judicial or policy-making decisions. Indeed, the premise underlying extending the state's own immunity down to it agencies and, in some instances, officers and employees is "that courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Id.* at 519. But the discretionary category is still somewhat broader, encompassing "the kind of discretion exercised at the operational level rather than exclusively at the policy-making or planning level." 63C Am.Jur.2d *Public Officers and Employees* § 318 (updated through Feb. 2014). The operational level, of course, is not direct service or "ground" level.

The distinction between discretionary acts and mandatory acts is essentially the difference between making higher-level decisions and giving orders to effectuate those decisions, and simply following orders. Or, as we have stated, "Promulgation of rules is a discretionary function; enforcement of those rules is a ministerial function." *Williams v. Kentucky Dept. of Educ.*, 113 S.W.3d 145, 150 (Ky.2003).

Thus, a ministerial act is a direct and mandatory act, and if it is properly performed there simply is no tort. But if such an act is omitted, or performed negligently, then that governmental employee has *no* immunity, and can be sued individually for his failure to act, or negligence in acting that causes harm. Of course, whether a ministerial act was performed properly, i.e., non-negligently, is a separate question from whether the act is ministerial, and is usually reserved for a jury. Qualified immunity applies only to

discretionary acts. And that immunity is more than just a defense; it alleviates the employee's or officer's need even to defend the suit, which is to be dismissed.

It is with this understanding of the law that we turn to the question of the nature of acts of the two principals and the teacher. To answer those questions, we must delve more into the facts.

The middle-school students arrived at school, some well in advance of starting time. As the children arrived prior to the start of school, they were kept in the gym until classes started. Three to five teachers and staff were assigned each day to monitor the arriving students. The students were assigned a specific section of the bleachers by grade, which was extended daily for the students to sit on by the custodian on duty. The middle-school principal was usually in the building, generally supervising morning activities. On the date Anthony Thomason fell on the bleachers and injured himself, the bleachers had not been properly extended.

The head custodian testified that the principal had directed the custodians to make sure everything was in proper order for the students' arrival, but also said he did not know whose responsibility it was to extend the bleachers that day because he was not on duty that day. Properly extending the bleachers was part of the custodians' assigned duty to prepare the gym for the students, but since the head custodian was not there that morning, he did not know why the custodian on duty had not done so. There were four teachers on duty that morning, and the middle-school principal was present but she had not gone into the gym.

One of the teachers, Eddie Hamilton, met the children in the school foyer and directed them to the gym. This was his usual practice in the performance of his assigned duties. Once the children were transitioned to the gym, he then supervised them until school started, or the other teacher could have done so. He had never been directed to do a safety inspection of the gym before bringing the children in, and as the other teacher testified, their duty would have been to remove the children if they found a dangerous condition *once they arrived in the gym.* Indeed, absent a reason to expect a problem with the bleachers (and none is indicated in the record), there would be no logical reason to so expand the teacher's duties, even though Hamilton agreed that he was required to be alert to safety concerns that he saw.

The two school principals named in this suit, Joe Marson and Carolyn Martin, served respectively as principal of the high school and the middle school. The gym is shared by both schools, but only the middle-school children were held in the gym before school started. Consequently, the supervision and management of the pre-class activities were under the authority of the middle-school principal, Martin. She testified that she had assigned the duty of preparing the gym for the students to the custodians, who did this on a routine, daily basis. The custodian who was on duty the morning of the accident, for whatever reason, was not made a party to this suit. Physically extending the bleachers is not a duty that has ever been performed by the principal herself, nor by the teachers.

In light of these facts, it is clear that extending the bleachers was a routine duty, regularly performed by the custodian on duty, and is thus ministerial in nature to the person charged with that job. Principal Martin testified that the duty of preparing the gym for the students' morning arrival had been assigned to the *custodians.* The only things necessary to prepare the gym were extending the bleachers for seating and turning on the lights. The

fact that the bleachers were extended *every day* is evidence that this was part of the original instructions given to the custodial staff—or at least evidence that these acts were obvious and necessary to carry out the task of preparing the gym. And, though the head custodian indicated he did not know who was responsible for extending the bleachers, in fact he or another custodian did it every day, and he admitted that the principal had told them to get the gym ready for the students each morning. The acts required of the custodians included this daily task as a part of performing their job.

The question of the custodian's liability or immunity, however, is not before the Court. Instead, the question is whether the principals and the teacher have immunity or may potentially be found liable.

Principal Martin herself never performed the specific task of pulling out the bleachers. As a principal, she is hired to administer the running of the school, not to personally perform each and every task that must be done in the course of a day. One of her tasks is to direct various school employees in their job performance by assigning job duties and to generally supervise them. She testified that she did so in regard to getting the gym prepared for the students in the mornings. The acts required by her job do not include actually performing tasks that she has assigned to others. Nor is she required to follow behind the custodians every time they extend the bleachers to see that the bleachers are properly extended, even though she has general supervision duties. That is the kind of job detail a supervisor cannot be responsible for.

■ There is a qualitative difference in actually extending the bleachers and assigning someone to fulfill that task. Actually extending the bleachers is a certain and required task for the custodians to whom the task is assigned, and is thus ministerial to them. It is not a task that is assigned to the principals, and is not a ministerial task as to them. Principals do have a duty to provide a safe school environment, but they are not insurers of children's safety. They must only be reasonably diligent in this task. Because that task is so situation specific, and because it requires judgment rather than a fixed, routine performance, looking out for children's safety is a discretionary function for a principal, exercised most often by establishing and implementing safety policies and procedures.

Martin's responsibility to look out for the students' safety was a general rather than a specific duty, requiring her to act in a discretionary manner by devising school procedures, assigning specific tasks to other employees, and providing general supervision of those employees. Her actions were at least at an operational level, if not a policy- or rule-setting level. Indeed, the principal ordered the custodians to prepare the gym and the teachers to watch the children and to move them around as needed in the morning.

■ As a principal, she did not have the specific duty to extend the bleachers properly, nor did she choose to undertake that duty. Indeed, principals are not generally required to do maintenance duties, although specific instructions could make such duties required and thus ministerial. *Whitt v. Reed,* 239 S.W.2d 489 (Ky.1951). Instead, Martin assigned the specific duty to prepare the gym to the custodians by requiring them to get the gym ready for students. She had no specific duty to do a daily inspection of the bleachers to see if they were properly extended, but only a duty to reasonably determine if the custodians were doing their jobs. What is required by the job assigned to the govern-

mental employee defines the nature of the acts the employee performs.

Similarly, she assigned teachers to direct and lead students getting off the buses before school. This too was discretionary decision-making at an operational level. There is no proof that Martin herself ever undertook to direct children coming off the buses or to lead them to the gym.

Martin's oversight and direction of the morning bus routine was a matter of her discretionary decision-making, not a specific directive from the school board. As such, she had to evaluate and exercise discretion in determining how that job was to be done. She assigned the specific duty of preparing the gym to the custodians, and the duty of coordinating the children's movement from the buses into the school and ultimately to the gym to the teachers on duty. Her general responsibility for students' safety was discretionary. She is therefore entitled to qualified official immunity.[2]

▆▆▆ As to Principal Marson, the record indicates that he had only a general supervisory duty over the high school's use of the gym, and did not participate in the morning routine of the middle-school students. His general duty to look out for the safety of the students is clearly discretionary in nature, and he is just as clearly entitled to qualified immunity.

▆▆▆ Eddie Hamilton, the teacher on bus duty who remains in the suit, requires a different result, however.

While immunity questions are always difficult, there must be at least a common-sense understanding of what a particular person's job requires. Hamilton was not charged with preparing the gym. Thus,

while teachers, like principals, can have ministerial duties to engage in maintenance tasks, *see Whitt v. Reed,* 239 S.W.2d 489 (Ky.1951), that was not the case here. Indeed, it is hard even to conceive of a tort theory with respect to Hamilton based on failing to pull out the bleachers. The only people with the specific duty of extending the bleachers were the custodians, which is to be expected. The teachers on duty supervised the children in the mornings, but that clearly did not include the specific duty of extending the bleachers.

According to Hamilton, though, he did have specific things he was required to do. In his deposition, he was asked what the "mandates or requirements" were for supervising break or bus duty. For both, he stated that in general, the teachers made sure the children were behaving properly and looked out for "any kinds of safety things that might cause problems for the kids." As examples, he stated the teachers looked out for things like a leak from a water fountain, things spilt on the floor, or a fallen broom that children could fall over.

But in addition to that, Hamilton said that as far as bus duty was concerned, there was a specific process that was followed on a daily, routine basis. When the children got off the bus, they were monitored in the foyer. Some were sent to eat breakfast, and the others remained with the teachers in the foyer. At about 7:30 a.m., the children were moved from the foyer to the gymnasium. The teachers had a duty schedule which is published as a list, and they rotated out the days they had bus duty. All teachers did bus duty at some time. The children were moved in the same path every day. The teachers gave the students a signal when it was

---

**2.** *Yanero* also requires that the discretionary acts be "in good faith; and … within the scope of the employee's authority." *Yanero v.*

*Davis,* 65 S.W.3d 510, 522 (Ky.2001). There is no question that these requirements were met.

time for them to move to the cafeteria or the gym. They proceeded down the hall to the gym doors, walked around the top of the gym, and descended stairs to the section of bleachers assigned to their grade level. They stayed in the gym until 8:00 a.m., when school was ready to start, at which time they left to go to their classrooms. During this time, the teachers were directly responsible for coordinating the children's movements and looking out for their safety.

On the day of Anthony's fall, Hamilton led the children to the doors and opened them. Per his usual practice, he waited until about half of the children had filed through, and then he stepped inside the doors. At that position, he testified that he could not see the section of bleachers that had not been extended, but he also did not proceed into the gym to look out for any impediments to movement. Instead, he stayed at the top of the gym, and let the students file down onto the bleachers. He further testified that he knew to report any problem he saw that might affect student safety. On that morning, he was talking to students as they came by, and did not see Anthony fall. But he also testified that two teachers "always" went to the gym:

A: Yeah, that's why we always have two (2) to go to the gymnasium. In case of an incident, a child gets hurt, one adult can, you know, take care of that problem while another adult stays with the kids.

What Hamilton has described is a set, specific routine for coordinating the children and looking out for their safety that he was specifically assigned to follow on the day in question. While the rules may not have been written down, it was clear that there was a standard procedure, similar to the unwritten rule in *Yanero. See Yanero*, 65 S.W.3d at 529. Hamilton was given a specific task to do bus duty, which included looking out for safety issues and taking the routine steps that were the established practice for bus duty at that school. As such, his job required him to perform specific acts that were not discretionary in nature. Indeed, this Court has repeatedly stated that a teacher's duty to supervise students is ministerial, as it requires enforcement of known rules. *See, e.g., Williams v. Kentucky Dept. of Educ.*, 113 S.W.3d 145, 150 (Ky.2003) (relying on *Yanero* and KRS 161.180(1)); *id.* at 155("Appellants could have brought an action in the Floyd Circuit Court against appropriate members of the faculty and staff of Betsy Lane High School for the negligent performance of their ministerial duties."); *Haney v. Monsky*, 311 S.W.3d 235, 244 (Ky.2010) (distinguishing between teacher supervising students and other situations involving supervising the conduct of others). On that morning, the governmental act Hamilton was required to do was to perform bus duty in the established and routine manner. This was a ministerial function.

Even though this ministerial act might permit some decision-making during the process, it was not his decision to set up and perform bus duty. It was required of him, and at that point in time was the mandatory governmental act. Consequently, he does not have qualified immunity, and can be sued individually. Whether his actions on that morning amount to a tort or not depends on whether he negligently failed to perform his mandatory acts, or negligently performed them, which is a question for a jury, assuming of course there is evidence that he acted unreasonably, that is, negligently.

There is certainly the temptation to say that a person such as a teacher acts in a discretionary manner, so that he may have immunity from suit, when the ministerial

act he is required to do—here supervision of bus duty—can have unexpected events occur. One might reason that it is impossible for a teacher to fully perform the ministerial duty of supervision of students because there are so many things involved in that process that are beyond what the teacher can control. For example, if a teacher is working with a student on one side of the room, and on the other side of the room a student stabs his desk mate with a pencil, it could rightfully be argued that no teacher could prevent all harm from coming to the children in his care. But that does not mean his supervision duty was discretionary, such that he would have immunity from suit.

Instead, the ministerial duty of supervision must be viewed through the lens of negligence. It is possible that some acts that happen when a teacher is supervising are outside the scope of what his supervision requires, and he will be entitled to a summary judgment as a matter of law. Or, as with the pencil stabbing, the question may be whether the teacher was negligent in his supervision, and then the reasonableness of the teacher's actions will be taken into account. Certainly, there are *defenses* to the claim that a teacher (or any official) has breached his ministerial duty. But that does not mean such a claim is barred by immunity. The nature of the *acts* performed by the teacher, or any governmental employee, determines whether they are discretionary or ministerial.

Immunity is reserved for those governmental acts that are not prescribed, but are done, such as policy-making or operational decisionmaking, without clear directive. The responsibility for such acts rests on the individual who has made a decision to act based on his judgment, without established routine, or someone else in the process to allow burden-shift-ing. For this reason, and to ensure that governmental officials will exercise discretion when needed, our law allows qualified immunity from suit on the performance of discretionary acts. This is a policy decision that has long been the law of the Commonwealth.

Here any liability for Hamilton must stem from his assigned responsibilities, which included coordinating the children's movements and looking out for their safety. That activity was within his assigned job and is ministerial in nature. Other acts, such as looking into the gym ahead of the children and possibly going before them in the event there was an unsafe condition that would require sending them back to the cafeteria are also ministerial, at least from the perspective of the act, since it is clear when looking at those acts that they are part and parcel of looking out for children under these circumstances. Whether his omission in this regard was unreasonable (and therefore negligent) cannot be determined as a matter of law, at least not on this record, and must instead be remanded to the trial court.

If we do not focus on the act, we risk limiting ministerial acts to almost nothing except those acts that are directly compelled by an order or rule. In so doing, we would undermine the rule that an act can be ministerial even though it has a component of discretion.

### III. Conclusion

For the reasons stated above, the Court of Appeals is reversed as to its decision regarding the principals and affirmed as to its decision regarding the teacher, and this case is remanded to the trial court to proceed accordingly.

MINTON, C.J.; ABRAMSON, SCOTT and VENTERS, JJ., concur.

CUNNINGHAM, J., concurs in part and dissents in part by separate opinion.

KELLER, J., not sitting.

CUNNINGHAM, J., Concurring in Part and Dissenting in Part.

I readily concur with most of the excellent analysis by Justice Noble. I dissent, however, that the teacher on bus duty, Eddie Hamilton, was performing a ministerial duty in regard to the placement of the bleachers in the gym. Whether the bleachers were pulled in or extended, or only half way extended on this particular day, would not have been under his direction. As the majority opinion states: "The teachers on duty supervised the children in the morning, but that clearly did not include the specific duty of extending the bleachers." Therefore, the duties of Hamilton were purely discretionary. In my opinion, he would also have qualified immunity. To that portion of the opinion, I respectfully dissent.