RENDERED: JUNE 10, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1004-MR

LARRY EDWARD MOFIELD AND
GLEN WILSON, IN THEIR INDIVIDUAL
CAPACITIES AS EMPLOYEES OF THE
MEADE COUNTY BOARD OF EDUCATION                    APPELLANTS

APPEAL FROM MEADE CIRCUIT COURT
v.          HONORABLE BRUCE T. BUTLER, JUDGE
ACTION NO. 19-CI-00096

HUNTER KNOTH                                              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; COMBS AND GOODWINE, JUDGES.

CLAYTON, CHIEF JUDGE: In 2015, Hunter Knoth was injured at a youth

football camp operated by two Meade County High School football coaches, Larry

Mofield and Glen Wilson. When Knoth reached the age of eighteen, he filed suit

against Mofield and Wilson, alleging negligence. The coaches filed a motion

seeking summary judgment on the basis of qualified official immunity, which the circuit court denied. Upon review, we affirm the circuit court's ruling because Mofield's and Wilson's duties at the football camp were primarily ministerial in nature.

The injury alleged by Knoth occurred at the Roy A. Peace Football Camp, a weeklong program sponsored by the Meade County High School football department. Mofield had been employed as a football coach at Meade County High School since 1990, first as an assistant and then as the head coach, and Wilson had twenty-four years of coaching experience at the high school. Mofield and Wilson started the camp to promote the sport and to develop the football skills of children from the second grade through the eighth grade. At the time of their depositions in 2020, they had been operating the camp for at least seventeen years.

Although the camp brochure from 2015 is no longer available, a similar brochure from 2017 stated in bold capital letters that it was a non-contact camp. It described the activities of the camp as including 7 v. 7 one hand touch/non-contact football games and other drills designed to teach football skills.

The camp was conducted under Mofield's leadership and Wilson ran the "nuts and bolts," making sure everyone was in the correct place and attending to any needs the students might have. Wilson was also responsible for much of the behind-the-scenes planning and advertising of the camp. Mofield and Wilson were

both on the grounds at the camp at all times overseeing and directly supervising the safety of the students.

The camp was held on three to four of the schools' full-length football fields. The campers were separated into leagues based on their age and each league was supervised by a varsity football coach. Mofield himself ran several leagues in addition to his supervisory duties. In 2015, Mofield was running the fourth, fifth, and sixth grade leagues. Wilson was usually stationed in the middle of the fields near a tent.

The coaches stressed to the participants that it was a "no-contact" camp and expected all adults to monitor and supervise the campers to make sure they were aware of and adhered to this expectation. The coaches did not require the campers to wear helmets because, in their judgment, they promoted more physicality. Wilson testified that children wearing helmets tend to think they are invincible. The coaches also made sure that the campers were not running at full speed during the 7 v. 7 scrimmages.

Julian Tackett, Commissioner of the Kentucky High School Athletics Association (KHSAA), testified that the KHSAA compiles all the rules and policies applicable to high school sports and publishes a handbook that is made available to schools through their athletic directors. Individuals must pass a test on the rules to become certified to coach by the KHSAA. Mofield and Wilson were

both certified by the KHSAA and completed the necessary training to ensure compliance with the rules. The training included information about the risk of head injuries in football.

In the spring of 2015, the KHSAA made emergency recommendations regarding the type of equipment that should be used at different levels of contact at high school football practices. Prior to the 2015 high school football season, it was left up to the coaches to decide what equipment to use at high school football practices. According to Tackett, the new recommendations applied only to high school football.

Mofield and Wilson became aware that the KHSAA was revising its rules about the use of equipment in football drills in the spring of 2015. Mofield testified that after those changes became final, he complied with them for all high school football practices starting in the fall of 2015. Mofield testified that the Roy A. Peace Football camp is separate from the high school football team and the KHSAA rules only govern high school sports.

In June 2015, Knoth was preparing to enter his first year at Meade County High School and was interested in playing freshman football. He and his father reviewed the camp pamphlet and, with his father's approval, Knoth signed up to participate.

Knoth was injured on his first day at the camp, June 3, 2015, while playing in a 7 v. 7 scrimmage. The players were not wearing helmets or any other protective equipment. As he went to catch a pass, Knoth collided with another player, whose head hit Knoth's nose. According to another camp participant, Kris Mayberry, Knoth was knocked unconscious. At the time of the accident, Mofield was on an adjacent field and did not see the accident. Wilson was between the football fields seated on a truck tailgate, watching the various leagues play. Wilson observed the ball being thrown, Knoth and another boy going for the pass and butting heads, and Knoth falling to the ground. He never observed Knoth lose consciousness. Both Mofield and Wilson arrived quickly at the scene.

Knoth could not recall what happened, except for holding a towel over his face to stop some bleeding. Knoth's father came promptly and took him away to receive medical attention. Knoth returned to camp the following day but did not participate in any drills or games. Two days later, his nose started bleeding and he was diagnosed with a broken nose. He underwent outpatient surgery to repair the fracture. He later decided not to join the Meade County High School football team and instead joined the wrestling team after being cleared to participate by his family doctor. During the 2015-2016 wrestling season, he failed to pass a concussion test and was not permitted to wrestle the remainder of his freshman year. He did pass the test in his sophomore year and resumed wrestling with the

varsity team for eleven matches, all of which he won. He was required to wear a facial guard during his wrestling matches which he disliked, and he ultimately left the team.

When Knoth reached the age of eighteen, he filed suit against Mofield in Meade Circuit Court, alleging that Mofield negligently and carelessly permitted the players, including Knoth, to engage in scrimmage drills without the use of helmets or other proper protective gear, despite advertising the camp as "no-contact." He later amended his complaint to add Wilson as a defendant. Mofield and Wilson filed a motion seeking summary judgment on the grounds of qualified official immunity, which the circuit court denied. This appeal followed.

Generally, the "denial of a motion for summary judgment is . . . not appealable because of its interlocutory nature[.]" *Transportation Cabinet, Bureau of Highways, Commonwealth of Ky. v. Leneave*, 751 S.W.2d 36, 37 (Ky. App. 1988). An exception is made for an order denying a substantial claim of absolute immunity or qualified official immunity, which is immediately appealable. *Harrod v. Caney*, 547 S.W.3d 536, 540 (Ky. App. 2018). In this type of case, "[s]ummary judgments play an especially important role as the defense renders one immune not just from liability, but also from suit itself." *Ritchie v. Turner*, 559 S.W.3d 822, 830 (Ky. 2018) (internal quotation marks and citations omitted). The scope of our review on appeal is strictly limited "to the issue of immunity, and no

-6-

substantive issues." *Baker v. Fields*, 543 S.W.3d 575, 578 (Ky. 2018). An appeals court reviews the issue of whether a school official is entitled to qualified official immunity *de novo.* *Ritchie*, 559 S.W.3d at 830 (citation omitted).

Qualified official immunity is intended to protect public officers and employees sued in their individual capacities "from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citation omitted). This type of immunity applies only "to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . ; (2) in good faith; and (3) within the scope of the employee's authority[.]" *Id.* (citations omitted). By contrast, immunity from tort liability is not afforded to government officials "for the negligent performance of a ministerial act." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016), *as modified on denial of rehearing* (Aug. 24, 2017).

The Kentucky Supreme Court has provided the following guidance for making this critical distinction: "[p]romulgation of rules is a discretionary function; enforcement of those rules is a ministerial function." *Id.* (quoting *Williams v. Kentucky Department of Education*, 113 S.W.3d 145, 150 (Ky. 2003)). Thus, "a duty is ministerial 'when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from

fixed and designated facts.'" *Id.* (citation omitted). "[A] government official performing a ministerial duty does so without particular concern for his own judgment; . . . the act is ministerial 'if the employee has no choice but to do the act.'" *Id.* (quoting *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014)).

Discretionary acts, on the other hand, involve "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* (citations omitted). "[A]t their core, discretionary acts are those involving quasi-judicial or policy-making decisions." *Marson*, 438 S.W.3d at 297. Immunity is provided for discretionary acts because the "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Yanero*, 65 S.W.3d at 519.

Mofield and Wilson argue that their duties at the football camp were discretionary because there was no clear, mandatory rule requiring the campers to wear helmets during a no-contact scrimmage. The evidence showed that any changes to the KHSAA rules regarding the use of helmets during practice were inapplicable, as they regulated only high school football and went into effect in the fall of 2015, after the camp was over. The coaches contend that their decision not to use helmets at the camp was a purely discretionary one, based on their

professional opinion that helmets encouraged reckless behavior on the part of the campers.

They rely on a line of cases in which school employees' duties are held to be ministerial when they are required to comply with established rules and policies. Thus, in the seminal case of *Yanero v. Davis*, the evidence established that helmets were routinely required during high school baseball team batting practices and consequently the coach was held to have a ministerial duty to enforce this known rule. *Yanero*, 65 S.W.3d at 529. In another case, high school teachers were found to be acting in a ministerial capacity when they failed to enforce a specific code of conduct governing student behavior. *Williams*, 113 S.W.3d at 151. In *Patton v. Bickford*, the Court ruled that because a school had specific and detailed policies requiring school staff to report instances of bullying among students, the teachers had a ministerial duty to do so. *Patton*, 529 S.W.3d at 725-28. Because this type of clear, unmistakable directive was absent in this case, Mofield and Wilson contend their duties cannot be characterized as ministerial.

But ministerial duties can involve more than the enforcement of rules. *Marson*, 438 S.W.3d at 302. "A degree of discretion with respect to the means or method to be employed in the performance of a duty does not strip away the ministerial nature of the duty." *Patton*, 529 S.W.3d at 728 (internal quotation marks and citation omitted). The Kentucky Supreme Court has cautioned that

ministerial acts should not be limited only to those "that are directly compelled by an order or rule." *Marson*, 438 S.W.3d at 302. Because "few acts are ever purely discretionary or purely ministerial," our analysis considers "the *dominant* nature of the act." *Ritchie*, 559 S.W.3d at 837 (citation omitted).

Thus, even in the absence of clear and specific rules and directives, a teacher's duty to supervise students has been held to be ministerial. *Marson*, 438 S.W.3d at 301. In *Marson v. Thomason*, a teacher was tasked with supervising middle school students as they arrived by bus and went to the gymnasium to wait for classes to start. *Id.* at 298. A student was injured when he fell from some bleachers which had not been extended by the custodian. Although the custodian had a clear, assigned duty to extend the bleachers as part of preparing the gymnasium for the students, there was no similarly unambiguous order or rule governing the duties of the teacher supervising the students during the morning bus duty. The Kentucky Supreme Court nonetheless held that the teacher's duty to supervise the students was ministerial because the teachers "were directly responsible" on a daily basis "for coordinating the children's movements and looking out for their safety." *Id.* at 301. Although there were no written rules, the teacher "was given a specific task to do bus duty, which included looking out for safety issues and taking the routine steps that were the established practice for bus duty at that school. As such, his job required him to perform specific acts that

-10-

were not discretionary in nature." *Id.* By contrast, the Court held that the school principal's responsibility to look out for the students' safety was a discretionary, rather than a ministerial, duty, because she devised school procedures, assigned specific tasks to other employees, and provided general supervision of those employees. *Id.* at 299. The principal's "actions were at least at an operational level, if not a policy- or rule-setting level." *Id.*

In applying this teacher-principal distinction to Mofield and Wilson, Knoth concedes that their duties included some discretionary aspects, such as general supervision, rule promulgation, and operational responsibility; but he contends that their direct supervision of student safety was sufficiently ministerial to defeat qualified immunity. We agree. The coaches assumed an active, on-the-ground responsibility to supervise the safety of the students at the football camp, which included personally enforcing the no-contact rule they had adopted. In his deposition, Mofield was asked: "[R]egardless of who was designated a coach, you're on the ground, and Glen Wilson is on the ground overseeing and running this camp, correct?" He replied: "Yes. Nobody – everybody's – it's all hands on deck. Yes." The primary nature of Mofield's and Wilson's duty at the camp was the direct and active supervision of the campers and Mofield personally ran three leagues of campers. Kris Mayberry testified that the coaches told them to slow down if they were running too fast. This general duty to look out actively for the

children's safety at the ground level was akin to that of the teacher in *Marson*, who described his task as "looking out for '**any kinds of safety things that might cause problems for the kids**.'" *Patton*, 529 S.W.3d at 728 (emphasis added) (citing *Marson*, 438 S.W.3d at 300, 302). As in this case, "[t]here was no formal policy or guideline that defined 'safety things' to alert the [coach] to specific potential safety issues." *Id*. But the Court nonetheless concluded that "[t]he need to use common sense and ordinary judgment to avoid negligence did not convert the task to a discretionary duty." *Id*.

Mofield and Wilson argue that their duty cannot have been ministerial because neither of them was actually present nor actively supervising the scrimmage at which Knoth was injured. "It is possible that some acts that happen when a [coach] is supervising are outside the scope of what his supervision requires, and he will be entitled to a summary judgment as a matter of law." *Marson*, 438 S.W.3d at 302. As the *Marson* Court explained, "if a teacher is working with a student on one side of the room, and on the other side of the room a student stabs his desk mate with a pencil, it could rightfully be argued that no teacher could prevent all harm from coming to the children in his care. But that does not mean his supervision duty was discretionary, such that he would have immunity from suit." *Id*. The fact that Mofield and Wilson were not directly present at the scene of injury is a potential defense to the claim that they breached

-12-

their ministerial duty. *Id.* "But that does not mean such a claim is barred by immunity. The nature of the *acts* performed by the teacher, or any governmental employee, determines whether they are discretionary or ministerial." *Id.*

Although Mofield and Wilson had rule-making and supervisory authority over the camp, under our case law the direct contact and control they exercised over the safety of the campers were ministerial in nature.

For the foregoing reasons, the order denying summary judgment on the basis of qualified official immunity is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Barbara A. Kriz
Lexington, Kentucky

BRIEF FOR APPELLEE:

Brandon W. Smith
New Albany, Indiana