RENDERED: AUGUST 16, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

NO. 2023-CA-1159-MR

ASHLEY V. BARNETTE,
INDIVIDUALLY AND IN HER
CAPACITY AS ADMINISTRATRIX
OF THE ESTATE OF KAMDEN
HUNTER WILLIAMS                                            APPELLANT


APPEAL FROM BELL CIRCUIT COURT
v.        HONORABLE KENT HENDRICKSON, SPECIAL JUDGE
ACTION NO. 19-CI-00134


ANGEL EVANS, JAMES
HENSLEY, AND LEIGHA SPROLES                                 APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CETRULO, GOODWINE, AND KAREM, JUDGES.

KAREM, JUDGE: Ashley V. Barnette ("Barnette"), individually and in her

capacity as administratrix of the Estate of Kamden Hunter Williams, appeals from

a Bell Circuit Court order granting summary judgment to Angel Evans ("Evans"),

James Hensley ("Hensley"), Leigha Sproles ("Sproles"), and all employees of both the Cabinet for Health and Family Services ("Cabinet") and the Department for Community Based Services ("DCBS"). Barnette brought a negligence action against the appellees stemming from the death of her young child and she now challenges the circuit court's ruling that the appellees are shielded by qualified official immunity. Upon careful review, we reverse and remand for findings by the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Barnette's late son, Kamden Hunter Williams ("Kamden"), was born on April 9, 2015. Barnette and Kamden's putative father, Kenneth W. Williams ("Williams"), were incarcerated for various drug offenses throughout most of Kamden's life. According to Barnette's affidavit in the record, Williams was arrested in June 2015 and Barnette was arrested and jailed in August 2015. In October 2015, the Bell District Court entered an order appointing Barnette's sister, Amber North ("North"), Kamden's guardian.

On March 6, 2018, North went out and left Kamden at her apartment in the care of her friends, Jessica Sullivan and Whitney Martin. While the two were asleep, Kamden, who was about to turn three years old at the time, managed to exit the front door of the apartment. Maintenance personnel found the toddler, wandering alone wearing only a T-shirt, and notified the police. During their

-2-

investigation, the police discovered marijuana in North's apartment. North told the police the marijuana belonged to her brother. The police reported the matter to the Bell County office of the DCBS.

Angel Evans was the DCBS child protective services worker assigned to conduct the investigation. According to Evans's affidavit, she went to North's apartment the same day and interviewed the police officer and the maintenance workers who found Kamden. She observed that Kamden was clean and did not appear to be scared. Sullivan and Martin told her that Kamden was asleep when they arrived to babysit, and they did not realize that he was able to open the door. North admitted that she may have forgotten to lock the door when she left Kamden with her friends. She explained she accepted guardianship of Kamden, her sister's child, because his mother was in prison and no one else would take him. North herself was trying to adjust to her recent divorce, and she confessed she could not pass a drug screen and would test positive for marijuana.

Evans determined that the risk of harm to Kamden did not justify seeking an emergency custody order. Evans's first-line supervisor was out of the office, so she consulted with the Service Region Administrator Associate, James Hensley. They decided it would be appropriate to ask North to sign a prevention plan in which she would agree to be supervised by a friend or family member. North did not want any of her ex-husband's family involved, and she suggested her

aunt, Amanda "Mandy" Brock ("Brock"), act as her supervisor. According to North, Brock had always helped her, and she loved Kamden. Brock agreed that North and Kamden could move into her home temporarily.

The Prevention Plan was signed by Amanda Brock, Amber North, and Angel Evans on March 6, 2018. It had three provisions: "Amber agrees to be supervised with Kamden at her Aunt Mandy's house until investigation is done[;] Amber agrees to provide a sober caretaker for Kamden at all times[;] and Amber agrees not to allow any drugs in the house with Kamden[.]"

Hensley asked Leigha Sproles, another social worker, to inspect Brock's home for any safety hazards. The home was found to be clean and appropriate; apart from a wood stove used for heat. Brock agreed to block the stove off so Kamden could not touch it. There is no evidence that anyone from DCBS checked to ensure that the stove was blocked.

On March 13, 2018, Evans learned that North had left Kamden with Brock. Brock reported that North had left and told her she would return later. Evans tried unsuccessfully to find North by going to her apartment, phoning her, and contacting her friends and family. She continued trying to locate North to no avail.

On March 30, 2018, Brock told Evans she needed to go to Lexington for a medical test and asked if Crystal Thomas ("Thomas")[1] could care for Kamden. In her affidavit, Evans states that ideally, North should have consented to this arrangement because she was Kamden's legal guardian. However, Evans could not locate her and nothing in DCBS's Standards of Practice ("SOP") indicated what to do in this situation. On April 3, 2018, Brock and Thomas came to the DCBS office with Kamden. He was clean and appropriately dressed. Brock had still not heard from North. Evans thought it was premature to ask a court to intervene and place Kamden in foster care or with a relative. She believed North would eventually return her calls because North had been leaving her messages.

On April 4, 2018, Evans received a call from Brianna Perry, the sister of North's ex-husband. She expressed an interest in being a placement for Kamden. According to Evans, her first priority was to restore Kamden to his legal guardian's custody, and insufficient time had gone by for her to presume North had abandoned the child. Also, North had made it clear to Evans that she did not want her ex-husband's family involved in caring for Kamden. Evans told Perry she could not interfere with North's choice of caregiver under the circumstances because Kamden was not in state custody.

---

[1] It is unclear from the record what relation Crystal Thomas is to any of the parties.

On April 10, Crystal Thomas told Evans she could no longer care for Kamden, and she expressed concern regarding his appearance while he was in Brock's care. On April 27, 2018, Evans tried to call North and Brock again about North's continued absence but was unable to reach them. She learned on April 28, 2018, that Kamden had tragically died in a fire at Brock's home. Brock had left him at the house in the care of her eleven-year-old son, awaiting the arrival of their babysitter. According to Barnette, Evans had told Brock she could leave Kamden in the care of the eleven-year-old. Brock was subsequently indicted, and a jury found her guilty of Wanton Endangerment in the 1st degree and Manslaughter in the 2nd degree, for which she is currently serving a prison sentence.[2]

Barnette filed a wrongful death complaint on May 8, 2015, naming as defendants the Secretary and the Commissioner of the Cabinet, in their official capacities; the Cabinet; and Evans, Hensley, and Sproles, in their official and individual capacities; and unknown defendants individually and in their official capacities as social workers or other employees of the Cabinet. Barnette also filed an action with the Kentucky Board of Claims which was held in abeyance until the resolution of the circuit court action.

---

[2] Information regarding the criminal case against Amanda Brock was procured by a search of CourtNet, Kentucky's litigation search engine. Judicial notice may not be taken of Kentucky CourtNet records to present as evidence in a trial. *See Marchese v. Aebersold*, 530 S.W.3d 441 (Ky. 2017). But information about the existence of charges may be referenced by an appellate court to provide perspective for the trial court proceedings. *See, e.g.*, *Mulazim v. Commonwealth*, 600 S.W.3d 183, 203 n.6 (Ky. 2020).

On May 22, 2019, the defendants removed the circuit case to federal court, which ultimately remanded the case to Bell Circuit Court. On July 27, 2020, Barnette moved to file an amended complaint to reflect what had occurred in the federal action, including the dismissal of some claims and defendants. The circuit court granted the motion on August 3, 2020. The only remaining defendants in the first amended complaint were Evans, Hensley, Sproles, and the unnamed individual defendants.

On September 3, 2020, the defendants filed a motion to dismiss or alternatively for summary judgment. They simultaneously filed a motion to stay discovery pending the court's ruling on their motion. Barnette filed a response.

The court conducted a hearing and took the motion under submission. On October 1, 2020, Barnette moved for leave to file a second amended complaint.

On November 6, 2020, the circuit judge disqualified himself and the case was assigned to a special judge.

On April 27, 2021, the defendants filed their opposition to the motion for leave to amend the complaint.

On September 9, 2021, the court entered an order holding the pending motions in abeyance while it reviewed the case law, records, and supplemental filings. One of the attorneys for the defendants was ordered to provide clarification about the Cabinet's duties, and whether they were discretionary or

ministerial. The defendants filed a supplemental memorandum of law to support their motion for summary judgment on October 11, 2021.

The circuit court conducted a status hearing on June 8, 2023. The court did not rule on Barnette's motion to file a second amended complaint. On July 26, 2023, the circuit court entered summary judgment in favor of Evans, Hensley, and Sproles, in their individual and official capacities. It ruled that these defendants were public officers or employees engaged in the exercise of discretionary governmental functions, or else acting in a discretionary manner within the scope of their employment, and as such, were entitled to immunity in their official capacities and qualified official immunity in their individual capacities. The court further found that there was no showing that any of these defendants acted objectively or subjectively in bad faith; however, the court did not include finality language in its order pursuant to Kentucky Rules of Civil Procedure ("CR") 54.02. On August 4, 2023, Barnette filed a motion to reconsider or to alter, amend, or vacate, which included a request for the court to amend its order adding finality language. On September 8, 2023, Barnette renewed her motion for the court to rule on the motion to file a second amended complaint. Following a hearing on September 14, 2023, the court entered a "(Corrected) Order" denying Barnette's motion to alter, amend, or vacate and included the language, "the judgment . . . is final as a matter of law." However, neither the

original summary judgment order nor the corrected order addressed Barnette's motion to file a second amended complaint. This appeal followed.

## PRELIMINARY ISSUE

This Court cannot ignore Barnette's blatant failure to follow the Kentucky Rules of Appellate Procedure ("RAP") in the drafting of her appellate brief. Barnette's brief does not conform to RAP 32(A)(3) requiring citations to the record in the statement of facts. Moreover, Barnette's subsequent arguments neither provide a preservation statement nor cite to the record. RAP 32(A) reads in pertinent part:

> **(A) Appellant's Opening Brief**. An appellant's opening brief must contain the following sections, in the following order.
>
> . . .
>
> (3) A **statement of the case** consisting of a summary of the facts and procedural events relevant and necessary to an understanding of the issues presented by the appeal, with ample references to the specific location in the record supporting each of the statements contained in the summary.
>
> (4) An **argument** conforming to the statement of points and authorities, with ample references to the specific location in the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner.

Often in appellate practice, when the deficiencies of an appellant's brief are identified by the appellees, as in this case, appellants will correct those deficiencies in the reply brief. However, in the case *sub judice*, Barnette doubles down on her transgressions by stating there is no need to follow the rules.

> Citing to each individual line . . . would probably not [only] be confusing, but[,] seems to have little value. Additionally, there was really nothing to preserve for appeal. We didn't get the chance to do anything but file the Complaints and brief whether or not the case should be dismissed.

Appellate procedural rules, including those for briefing, cannot be ignored by appellate advocates. *See Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky. App. 2010) (citation omitted). "They are lights and buoys to mark the channels of safe passage and assure an expeditious voyage to the right destination." *Id.* "Our options when an appellate advocate fails to abide by the rules are: (1) to ignore the deficiency and proceed with the review; (2) to strike the brief or its offending portions, [RAP 31(H)(1)]; or (3) to review the issues raised in the brief for manifest injustice only[.]" *Id.* (citing *Elwell v. Stone*, 799 S.W.2d 46, 47 (Ky. App. 1990)). Because the record is small, and we have been able to determine Barnette's arguments were properly preserved, we will ignore the deficiency and proceed with the review. However, in the future, this Court may not be so tolerant, and counsel is admonished to strictly follow the rules or risk having their brief stricken and/or being held in contempt.

## STANDARD OF REVIEW

In reviewing a grant of summary judgment, our inquiry focuses on "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); CR 56.03. The trial court is required to view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo*." *City of Brooksville v. Warner*, 533 S.W.3d 688, 692 (Ky. App. 2017) (quoting *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001)). Whether an official is entitled to qualified official immunity is a question of law that is reviewed *de novo*. *Ritchie v. Turner*, 559 S.W.3d 822, 830 (Ky. 2018) (citation omitted).

## ANALYSIS

Barnette argues that the circuit court should have: (1) permitted additional discovery, (2) made more factual findings before deciding whether the defendants were entitled to qualified official immunity, and (3) ruled on her motion to file a second amended complaint.

# 1.  **ADDITIONAL DISCOVERY**

As to Barnette's first argument, we disagree that the court should have permitted additional discovery.

> According to CR 56.02, a defendant "may, at any time, move with or without supporting affidavits for a summary judgment in his favor . . . ."  Although a defendant is permitted to move for a summary judgment at any time, this Court has cautioned trial courts not to take up these motions prematurely and to consider summary judgment motions "only after the opposing party has been given ample opportunity to complete discovery." *Pendleton Bros. Vending, Inc. v. Commonwealth Finance and Admin. Cabinet*, 758 S.W.2d 24, 29 (Ky. 1988). Thus, even though an appellate court always reviews the substance of a trial court's summary judgment ruling *de novo*, *i.e.*, to determine whether the record reflects a genuine issue of material fact, a reviewing court must also consider whether the trial court gave the party opposing the motion an ample opportunity to respond and complete discovery before the court entered its ruling.

*Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010).  In the case *sub judice*, the original complaint was filed on April 26, 2019, and amended on July 7, 2020. Status hearings were held on July 9, 2021; September 9, 2021; and June 8, 2023. Affidavits of Barnette, Evans, Hensley, and Sproles were placed in the record. Additionally, at the court's request, the Cabinet produced an email to Evans from Brianna Perry volunteering to foster the child.  It was not until July 26, 2023 that the court granted the Motion for Summary Judgment – over four years after the

filing of the initial complaint. Thus, we find the trial court gave the parties ample opportunity to respond and complete discovery before making its decision.

## 2. **QUALIFIED IMMUNITY**

Qualified official immunity is intended to protect public officers and employees sued in their individual capacities "from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citation omitted). This type of immunity applies only "to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (citations omitted). By contrast, "[a] government official is not afforded immunity from tort liability for the negligent performance of a ministerial act." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016), *as modified on denial of rehearing* (Aug. 24, 2017).

"[P]romulgation of rules is a discretionary function; enforcement of those rules is a ministerial function." *Id.* (quoting *Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 150 (Ky. 2003)). A "ministerial act or function is one that the government employee must do without regard to his or her own judgment or opinion concerning the propriety of the act to be performed." *Marson v.*

*Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (internal quotation marks and citation omitted).

Discretionary acts, by contrast, "are those involving quasi-judicial or policy-making decisions." *Id.* Immunity is provided for discretionary acts because the "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Yanero*, 65 S.W.3d at 519.

We agree that the circuit court's order granting summary judgment did not contain any findings identifying the nature or source of the defendants' duties and why it believed these duties were discretionary. "[T]rial courts must make certain factual findings when deciding a party's entitlement to qualified official immunity, and a modicum of discovery may be necessary before the court can reasonably make the determination." *Meinhart v. Louisville Metro Government*, 627 S.W.3d 824, 829-30 (Ky. 2021). These findings need not be extensive, but they "should be complete enough to enable adequate appellate review[.]" *Id.* at 830. The Kentucky Supreme Court has emphasized that the findings "must necessarily be limited to the very narrow issues required to determine if immunity is applicable, including the actor's status as a government official; the ministerial/discretionary distinction; if the act was ministerial, was the

-14-

actor negligent; and, if the act was discretionary, was it done in good faith and within the scope of the officer's authority." *Id*.

The circuit court's task in this regard was made more difficult by the lack of specificity in Barnette's pleadings, motions, and other filings, which cite numerous DCBS SOPs, without explaining which sections of these lengthy and detailed documents created specific ministerial duties pertinent to the facts of this case. Furthermore, at least two of the SOPs Barnette relies upon were substantially amended after 2018 and were not in effect at all during the relevant period.

The order granting summary judgment must be reversed and the case remanded to the circuit court. If the circuit court deems it necessary, it *may* order additional briefing, or permit discovery, or both. However, whether the trial court finds it necessary to permit additional discovery or not, it must enter a new order with findings in accordance with the standards described in *Meinhart*, *supra*.

### 3. BARNETTE'S MOTION TO FILE 2ND AMENDED COMPLAINT

As to Barnette's last allegation of error, we disagree that the trial judge was required to rule on her motion for leave to file a second amended complaint. However, we also disagree with the appellee's contention that the trial court "effectively overruled" Barnette's motion. Rather we find that Barnette failed to exercise reasonable diligence to obtain a ruling on her motion before it became a moot issue.

Barnette's original motion was filed October 1, 2020, following the defendants' September 3, 2020 motion to dismiss or, alternatively, for summary judgment. The court granted summary judgment on July 26, 2023. It was only after the court's ruling that Barnette brought the outstanding motion to the court's attention. Prior to that time, Barnette had been silent as to that motion for 3 years.

The Supreme Court opined in a similar case, *McGaha v. McGaha*, 664 S.W.3d 496, 505 (Ky. 2022), "parties who sit on their rights do so at their own peril." In *McGaha*, Damon McGaha filed suit against June McGaha, Mark McGaha, Suzanne McGaha, and Cliff McGaha, his stepmother, brother, sister, and nephew, respectively, challenging the validity of his father's will and alleging undue influence and breach of fiduciary duty by June and Mark. Suzanne and Cliff filed a joint answer denying all allegations in the complaint, making no cross-claims or counterclaims in so doing. Five years later, Damon filed a notice of dismissal noting a settlement of all claims against June and Mark. Suzanne quickly filed both a motion for leave to amend her answer to assert cross-claims and her objection to a dismissal of the action. The trial court subsequently issued an order dismissing the case as settled and denying Suzanne's motions. The Supreme Court held that:

> Suzanne sought to amend her answer in 2019 and only
> after Damon filed a notice of dismissal with the circuit
> court. As such, Suzanne's delay in litigating her claims

justifies both denial of her motion for leave to amend and dismissal of the action generally.

In sum, once Damon's claims against June and Mark were settled as demonstrated by the notice, there were no active claims left in this action. Upon denial of Suzanne's later-filed motion to amend answer to assert cross-claims, there were similarly no active issues for the circuit court to resolve. As a result, dismissal without prejudice was appropriate under CR 41.01(2).

*Id.* (footnote omitted). Similarly, in the case *sub judice*, Barnette waited too long to bring the issue to the court's attention. All claims were resolved prior to Barnette's September 8, 2023 renewed motion to file a second amended complaint: therefore, the trial court properly ignored Barnette's motion.

## CONCLUSION

The order granting summary judgment is reversed and the case is remanded for further proceedings, if necessary, and the entry of factual findings by the circuit court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

C. Matthew Feltner
London, Kentucky

BRIEF FOR APPELLEES:

Carmen M. Ross
Blake A. Vogt
Frankfort, Kentucky