RENDERED: MAY 9, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0651-MR


ALLAN KREBS, MATTHEW[1]
HOUSTON, AND KENTON
COUNTY AIRPORT BOARD                      APPELLANTS


|  | APPEAL FROM BOONE CIRCUIT COURT |
|---|---|
| v. | HONORABLE RICHARD A. BRUEGGEMANN, JUDGE |
|  | ACTION NO. 22-CI-00338 |


JEFF GRANT, BARB GRANT,
DELTA AIRLINES, INC. (THROUGH
SEDGWICK CLAIMS
MANAGEMENT SERVICES),
AND RYTEC CORPORATION                      APPELLEES

---

[1] Both parties erroneously styled their briefs as if they were filing documents with the trial court, listing Jeff Grant as Plaintiff and Allan Krebs as Defendant. Kentucky Rules of Appellate Procedure ("RAP") 5(B)(1) describes the proper way to caption a document, "[a]ll documents filed pursuant to these rules shall have a caption setting forth the name of the court, the style of the action, the case number, and a title. The style of the action may include the names and designations of all the parties or may state the name and designation of the first party on each side with an appropriate indication of other parties." Because the case is before an appellate court, parties should be designated as Appellant and Appellee so as not to confuse the reader as to which party is challenging the ruling below. Therefore, this Opinion uses the proper style of the case pursuant to RAP.

\*\* \*\* \*\* \*\* \*\*

BEFORE:  EASTON, ECKERLE, AND KAREM, JUDGES.

KAREM, JUDGE:  Jeff Grant was working as a baggage handler at the Cincinnati/Northern Kentucky International Airport ("the Airport") when an overhead garage door closed and struck him.  Grant and his wife filed a personal injury suit against the Kenton County Airport Board ("the Board"), several Airport employees, and the door manufacturer.  The Airport defendants, invoking immunity defenses, filed a motion for summary judgment, which the Kenton Circuit Court granted in part and denied in part.  The Board and two of the employee defendants, Matt Houston and Allan Krebs, brought this interlocutory appeal from that judgment, challenging the circuit court's ruling that they are not entitled to qualified official immunity.  Upon careful review, we agree with the circuit court that Houston and Krebs's duties were primarily ministerial and, consequently, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Jeff Grant was employed by Delta Air Lines ("Delta") as a baggage handler.  The accident occurred in a baggage loading area known as the A-Hub. The A-Hub has numerous automatic overhead doors that lead directly outside.  The baggage handlers drive tugs that tow baggage carts through the doors, which are

designed to open and shut automatically. There is a motion detector set above each door, a metal sensor in the floor, and photo sensors set in the door frame. Evidence was presented that this type of door closes very quickly.

On March 31, 2021, as Grant was walking through one of these overhead doors, it closed and hit his head and shoulder, knocking him to the ground. Seventeen months before, on November 1, 2019, another Delta employee, Ian Petrunia, was hit by the same door as he walked under it. Petrunia was knocked to the ground and taken to the hospital for a suspected concussion. He was not diagnosed with a concussion but did suffer some muscle strain.

Before Grant's accident, there was a posted notice by each U-Hub door that read, "Warning. Stand clear when door is in motion." Following his accident, larger signs were added warning that the door could start at any time without warning and not to stand in the path of the door.

Grant and his wife Barb filed a personal injury lawsuit against the Board, which operates the Airport; Chris Snyder, Matt Houston, and Allan Krebs, all employees of the Board; unknown persons working for the Board; and Rytec Corporation, the manufacturer of the door. As to the Airport defendants, the complaint alleged that they owed Grant a duty to design, construct, and maintain the A-Hub area in a reasonably safe condition, to inspect the premises and operations and facilities for any unreasonably dangerous conditions, to correct

these conditions, and to warn of these conditions. The defendants filed a motion to dismiss, which the circuit court denied. After extensive discovery, the Board filed a renewed motion to dismiss and/or for summary judgment. The circuit court dismissed with prejudice all claims asserted against the Board on the grounds that it is a county agency entitled to sovereign immunity under *Comair, Inc. v. Lexington-Fayette Urban County Airport Corporation*, 295 S.W.3d 91, 102 (Ky. 2009); it dismissed the claims against the unknown persons working for the Board because the claims were abandoned by the plaintiffs; and it held that Chris Snyder, the Senior Manager for Safety Compliance at the Airport, was entitled to qualified official immunity. It further held that Houston, the Senior Manager of Facilities Maintenance, and Krebs, the Commercial Door Specialist, were not entitled to qualified official immunity because their job duties were primarily ministerial. It denied a subsequent motion to reconsider, and this appeal by Krebs and Houston followed. Further facts will be set forth below.

## STANDARD OF REVIEW

Generally, the "denial of a motion for summary judgment is . . . not appealable because of its interlocutory nature[.]" *Transportation Cabinet, Bureau of Highways, Commonwealth of Kentucky v. Leneave*, 751 S.W.2d 36, 37 (Ky. App. 1988). An exception is made for an order denying a substantial claim of absolute immunity or qualified official immunity, which is immediately

-4-

appealable. *Harrod v. Caney*, 547 S.W.3d 536, 540 (Ky. App. 2018). The scope of our review on appeal is strictly limited "to the issue of immunity, and no substantive issues." *Baker v. Fields*, 543 S.W.3d 575, 578 (Ky. 2018). Whether an official is entitled to qualified official immunity is a question of law that is reviewed *de novo*. *Barnette v. Evans*, 697 S.W.3d 749, 755 (Ky. App. 2024) (citing *Ritchie v. Turner*, 559 S.W.3d 822, 830 (Ky. 2018)).

## ANALYSIS

When public employees are sued in their individual capacities, they may be protected by qualified official immunity. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). This form of immunity shields only "the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . ; (2) in good faith; and (3) within the scope of the employee's authority[.]" *Id.* "[A]t their core, discretionary acts are those involving quasi-judicial or policy-making decisions." *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014). Immunity is provided for discretionary acts because the "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Yanero*, 65 S.W.3d at 519.

-5-

By contrast, immunity from tort liability is not afforded to government officials "for the negligent performance of a ministerial act." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016), *as modified on denial of rehearing* (Aug. 24, 2017). "[A] duty is ministerial 'when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Id.* (citation omitted). "[A] government official performing a ministerial duty does so without particular concern for his own judgment; . . . the act is ministerial 'if the employee has no choice but to do the act.'" *Id.* (citations omitted).

The Kentucky Supreme Court has cautioned, however, that ministerial acts are not limited only to those "that are directly compelled by an order or rule." *Marson*, 438 S.W.3d at 302. "A degree of discretion with respect to the means or method to be employed in the performance of a duty does not strip away the ministerial nature of the duty." *Patton*, 529 S.W.3d at 728 (internal quotation marks and citation omitted). Because "few acts are ever purely discretionary or purely ministerial," our analysis considers "the *dominant* nature of the act." *Ritchie*, 559 S.W.3d at 837 (citation omitted). Houston and Krebs argue that they are entitled to qualified official immunity because their positions were predominantly discretionary, even if certain responsibilities or aspects of their jobs appear ministerial.

-6-

Houston's official job title was Senior Manager – Facilities Maintenance. According to the official job description for this position, he was responsible for "the management and oversight of the Facilities Maintenance Department" which operates and maintains Airport Board-owned facilities, including the infrastructure and utilities for the terminal and passenger areas and the support buildings. Houston's task was to "coordinate and manage staff, budgets, and subcontractors, as well as overseeing corrective and preventative maintenance activities for various building systems." When he was asked to comment on the part of the job description which required him to conduct "routine facility inspections to ensure facilities are maintained properly to maximize useful life," he replied: "To me, that means the good, old-fashioned management by walking around, um, I'm not a tradesman per se, but I know what right looks like in many circumstances and, specifically, I can look for things that will catch the passenger's eye to ensure that we're – that everything is operating as it should."

Specifically in reference to the A-Hub doors, Houston testified that "we are responsible for maintaining the A-Hub garage doors to operate as designed." At least once a month he would perform a routine inspection of the doors to ensure they were "operating the way that they're supposed to." He would observe the baggage handlers and see if the doors were "working right." He

further testified that if hazards were present and could be repaired by facilities maintenance "then it is ultimately my responsibility to see that they are corrected."

Houston testified that the A-Hub doors are not designed for pedestrian traffic, and the Airport does not permit its employees to walk through the garage doors. He explained that the Airport does not, however, have control over the airline employees. Houston recommended to the Board that they direct Delta to instruct their employees to not walk under the garage doors, but he had no first-hand knowledge of whether that message was communicated to Delta. He testified that he did see baggage handlers for Delta and other airlines walking through the doors all the time. According to answers to requests for admissions produced by Delta, which was an intervening plaintiff in this lawsuit, Delta was never notified or warned by the Board that Delta's employees should not walk under the A-Hub doors.

Krebs's job description was "Facilities Maintenance Specialist – Commercial Door." He was tasked with repairing and maintaining the mechanical and electronic components of all automatic doors and establishing a preventative maintenance program. He performed regular, routine inspections of the doors. Krebs testified that he drove around the A-Hub every day and tested each overhead door to ensure it was functioning properly. Krebs was also responsible for corrective maintenance and repair of the doors, including the locks, keypads, and

electronics. His job description specified that he was to provide service that met all safety specifications. Krebs testified he did not need to contact Houston to approve day-to-day repair and maintenance of the doors unless it involved a large amount of money.

The circuit court concluded that Houston's duties were primarily ministerial, relying on his testimony that if hazards were present and could be repaired by facilities maintenance, it was ultimately his responsibility to see that they were corrected. As to Krebs, the court concluded his duties were also primarily ministerial, citing his testimony that it was his job to detect if there was a problem with the doors and, if there was a problem, to repair it.

The circuit court analogized Houston and Krebs's duties to those of a mining inspector for the Cabinet of Natural Resources and Environmental Protection in *Collins v. Commonwealth of Kentucky Natural Resources and Environmental Protection Cabinet*, 10 S.W.3d 122 (Ky. 1999). The inspector failed to find that a culvert pipe was undersized and obstructed. As a result, a nearby roadway was flooded following heavy rain, and a child riding his bike in the area slid into the water and drowned. The inspector's duties were defined by Kentucky statutes and regulations which "require the Cabinet's mining inspectors to perform inspections of access and haul roads and culverts and determine that their discharge capacity is adequate and that they are not blocked in any way that

would impede drainage." *Id*. at 126. The inspector's duties were held to be ministerial because:

> Inspecting drainage culverts to assure they conform to these regulations does not require any significant judgment, statutory interpretation, or policy-making decisions. Instead, these inspections require attention to specific details, such as whether the culvert is blocked and whether it is large enough to handle a specified amount of water. The regulations can be enforced in a routine, ministerial manner, and thus their negligent performance may be actionable[.]

*Id*.

> The circuit court stated in regard to Houston and Krebs that:
>
> Inspecting proper door function, performing repairs, and posting warnings, seem comparable to inspecting a culvert for size and obstruction. Inspecting the culvert involved the measuring of it for calculation of size needed for drainage area. Inspecting the door function involved checking it for required safety function. Similarly, viewing the function of the door for malfunction seems akin to checking to verify a culvert is free from obstruction.

The circuit court further found that Houston and Krebs were both aware of the door's dangerous operation because Delta employee Ian Petrunia had previously been injured by the same door. The day after Petrunia's accident, Krebs sent an email stating: "It was one of those timing things where the guy was just about starting through the doors and the door started down. Those doors are not real tall so if the guy was roughly 6 foot it would have took [sic] a split second for

-10-

the door to be on top of him if he was coming through the opening." The circuit court concluded that this notice amplified the defendants' duty to act because they had been placed on notice that a hazard existed.

Houston and Krebs argue that the circuit court failed to make any kind of meaningful distinction between themselves and Snyder, the Senior Manager for Safety Compliance. The circuit court determined that Snyder was entitled to qualified official immunity because he was an administrator removed from day-to-day, hands-on functions, who ensured safety through developing policies and monitoring compliance. Krebs and Houston object to the trial court's differentiation of their positions from Snyder's on these grounds, noting that the courts have cautioned against transforming a discretionary task into a ministerial one simply because it seems routine. "The fact that an agency occasionally or even regularly engages in a particular act does not necessarily mean that the act is a routine duty not involving significant judgment, statutory interpretation, or policy-making decisions." *Commonwealth, Transp. Cabinet, Dept. of Highways v. Sexton*, 256 S.W.3d 29, 32-33 (Ky. 2008), *as corrected* (Aug. 26, 2008) (internal quotation marks and citations omitted).

Houston argues that his duties were similar in character to Snyder's, pointing to his deposition testimony that his primary job responsibility was to oversee the Facilities Maintenance Department, that he counseled, coached, and

organized policies and procedures for the Airport, and that he made sure objectives were met and the facilities operated as designed. He argues that he had to use his discretion to determine the best safety measures for the facility. In regard to the A-Hub overhead doors, he stated that he and Krebs would work together to decide if the doors needed to be replaced, and they took several factors into account in making these decisions.

Krebs and Houston were questioned about their compliance with Rytec's Owner's Manual for the doors and their awareness of the recommendations made by DASMA, the Door & Access Systems Manufacturers' Association. According to a DASMA technical data sheet, the members of DASMA agreed there was a need to create uniform warning labels to be affixed to high-performance door products such as the Rytec overhead doors. When Houston was asked about posting warning signs, he testified that he would have consulted with Krebs and probably with Snyder, as the safety representative, to find the best course of action to mitigate the hazard caused by people walking under the A-Hub doors. He argues that his testimony proves that the decision required discretion and judgment after a discussion with those employees.

Similarly, Krebs argues that the dominant aspect of his position was discretionary rather than ministerial. He acknowledges that he had a routine maintenance schedule when he started his position, but he altered it to fit the needs

of the facility and designed a better maintenance schedule for the doors. Houston testified that while Krebs was responsible for the maintenance of the doors, he was not responsible for their safe operation. He explained that the way individuals chose to operate the doors could lead to hazardous conditions and that Krebs's responsibility was to ensure the commercial doors were maintained and operated as designed. As to industry standards, Houston stated that he expected Krebs to use his judgment as to their applicability and to apply them where he felt it necessary. He testified that Krebs had the discretion to assess hazards in accordance with their probability and severity and to assess what mitigations could be taken. Krebs testified that he was not aware that the Rytec Owner's Manual contained numerous safety warnings. According to Krebs, he decided on remedial measures, and he had multiple possibilities from which to choose, and the Airport expected him to exercise discretion and judgment. He points to the description of the essential duties for his position of utilizing "various methods including expert judgment and data analysis to evaluate the condition of all equipment and systems for airport facilities to anticipate repair and replacement needs."

Although Houston and Krebs were called upon to exercise some judgment and discretion in the performance of their duties, those duties were nonetheless primarily ministerial. They were both directly involved in monitoring and maintaining the functioning of the A-Hub doors, and their duty to do so was

-13-

mandatory, as set forth in their official job descriptions and their own deposition testimony. Krebs was more hands-on, in that he inspected the doors daily and was capable of repairing them, but both Houston and Krebs had an unambiguous duty to inspect and maintain the doors. Houston acknowledged that if hazards were present and could be repaired by facilities maintenance, it was his responsibility to see that they were corrected. This duty did not involve a significant exercise of discretion or the formulation of policy.

Houston and Krebs further argue that the circuit court erred in determining that the prior incident in which Delta employee Ian Petrunia was injured by the A-Hub door amplified their duty to act by providing notice of the door's dangerous condition or operation. The circuit court cited *Sexton*, *supra*, and *Collins*, *supra*, for the proposition that in the absence of a statute, regulation or case law imposing a duty, notice of a dangerous condition may create a ministerial duty to act.

In *Sexton*, a dead tree located on state property fell on the neighboring property, damaging a garage and house. The landowner filed suit against the Department of Highways, arguing that it had a ministerial duty to inspect trees on its land. The Kentucky Supreme Court disagreed because there was no statute, regulation, or case law imposing a duty to inspect the soundness of trees on property belonging to the Department. The Court recognized that the Department

-14-

did have a statutorily imposed duty to "[i]nvestigate all problems relating to the construction and maintenance of roads in the state," which could lead to a duty to inspect trees that could directly affect the construction and maintenance of roads. *Sexton*, 256 S.W.3d at 33-34. Such a duty was not present under the facts in *Sexton*, however, because "despite relatively close proximity to a highway department construction site, the condition of the trees in the vacant lot owned by the Commonwealth here did not affect the construction or maintenance of roads in any manner." *Id.* The Court did go on to state that "though we need not definitively decide the issue in this case, if a state entity has actual notice of the existence of a dead or dangerous tree on property owned by that state entity, inspecting or removing the tree may be a ministerial act." *Id.* at 33.

The Court employed similar reasoning in a case involving a camp counselor who was supervising children on a "Night Hike," which simulated darkness by having all the children blindfolded. *Haney v. Monsky*, 311 S.W.3d 235, 245 (Ky. 2010), *as corrected* (May 7, 2010). Some of the children strayed from the pathway, despite the counselor's warning, and one of the children fell and fractured his shoulder. The Court held that the counselor's duties were not ministerial because "she was essentially asked to supervise the safety of the children to the best of her ability in an event that occurred in an unpredictable manner." *Id.* at 245. Again, because there was no clear-cut statute, regulation, or

precedent specifying how she should supervise the Night Hike, the Court was reluctant to find that the counselor's duties were ministerial. That element of unpredictability was not present in this case, because Petrunia's accident had alerted Krebs and Houston to the potential for injury. Not only was the duty to inspect the doors and ensure they were operating properly integral to their jobs, but their knowledge that an airline employee had been hurt by one of the doors intensified the duty to mitigate what may have been an unreasonably unsafe condition. Any other approach would "risk limiting ministerial acts to almost nothing except those acts that are directly compelled by an order or rule. In so doing, we would undermine the rule that an act can be ministerial even though it has a component of discretion." *Marson*, 438 S.W.3d at 302.

"Only the issue of qualified official immunity may be decided upon an interlocutory appeal of such issue, not . . . the substantive claim of negligence." *Baker*, 543 S.W.3d at 578. Whether Krebs and Houston were negligent in any regard, is completely beyond the scope of this appeal. "[W]hether a ministerial act was performed properly, i.e., non-negligently, is a separate question from whether the act is ministerial, and is usually reserved for a jury." *Marson*, 438 S.W.3d at 297.

# CONCLUSION

For the foregoing reasons, the Kenton Circuit Court's denial of summary judgment to Houston and Krebs is affirmed.

ALL CONCUR.

| | |
|---|---|
| BRIEFS FOR APPELLANTS ALLAN KREBS AND MATTHEW HOUSTON: | BRIEF FOR APPELLEES JEFF GRANT AND BARB GRANT: |
| | David M. Blank |
| N. Jeffrey Blankenship | Covington, Kentucky |
| Covington, Kentucky | |
| | NO BRIEF FILED FOR APPELLEES DELTA AIRLINES, INC. (THROUGH SEDGWICK CLAIMS MANAGEMENT SERVICES), AND RYTEC CORPORATION. |